SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**In the Matter of the Application of the State of New Jersey for the Forfeiture of Personal Weapons and Firearms Identification Card Belonging to F.M. (A-60-14) (074964)**

**Argued March 1, 2016 -- Decided June 30, 2016**

**SOLOMON, J., writing for a unanimous Court.**

The issue in this appeal is whether respondent F.M.'s personal firearm and firearms purchaser identification card (identification card), seized pursuant to the Prevention of Domestic Violence Act of 1991, N.J.S.A. 2C:25-17 to -35 (Domestic Violence Act), should be forfeited pursuant to N.J.S.A. 2C:58-3(c)(5) based on the State's claim that rearming F.M. "would not be in the interest of the public health, safety or welfare."

The incident of domestic violence that gave rise to these proceedings occurred on March 14, 2010, after F.M. and G.M. had separated. F.M. came to the marital residence to visit and go out with their children. G.M., claiming F.M. did not have visitation scheduled for that day, held on to the rear spoiler of F.M.'s automobile to prevent him from leaving with the children. The altercation was ongoing when Officer Brian McDonnell of the Morristown Police Department arrived at the residence on a report of domestic violence. As the officer approached, he observed F.M. pull G.M. off of F.M.'s vehicle and attempt to "throw" her, face forward, onto a four-foot stone retaining wall. Observing injuries on G.M.'s forearm, the officer arrested F.M. for domestic violence and charged him with simple assault. As a result of that incident (the March 14 incident), G.M. obtained a temporary restraining order (TRO), and the Roseland Police Department confiscated F.M.'s personal firearm and ankle knife. (F.M. was employed as an officer with the Roseland Police Department.)

At the final restraining order (FRO) hearing, G.M. contended that F.M. had entered the marital residence unannounced and without her permission, in violation of a Consent Order entered into on February 17, 2010. The Family Part concluded that there was insufficient evidence to sustain G.M.'s application for a final restraining order. The court dismissed the simple assault charge against F.M. after he completed court-ordered counseling. The State filed a motion to forfeit F.M.'s personal weapon and identification card. During the motion hearing, the prosecutor advised the court that the Roseland Police Department had determined F.M. was fit for light duty only. The judge ordered the department to retain F.M.'s personal and service weapons until further order of the court, and ordered that F.M. attend an approved batterer-intervention program and individual counseling. F.M. completed the court-ordered batterer-intervention program and counseling and, in September 2012, filed a motion seeking the return of his personal weapon. Based on F.M.'s history of domestic violence, the State opposed the motion, arguing that returning F.M.'s weapon "would not be in the interest of public health, safety or welfare." N.J.S.A. 2C:58-3(c)(5).

At the evidentiary hearing on the State's motion to forfeit F.M.'s personal weapon and identification card, G.M. testified to reported and unreported incidents of domestic violence. G.M. testified that in one incident, F.M. "sat on" her during a verbal altercation and placed a gun to her head. On another occasion, F.M. "grabbed [her] neck," "forced [her] to the ground," "handcuffed [her] in front of [their] children," and "dragged [her] out of the room." G.M. also elaborated on the details of the March 14 incident, stating that F.M. pulled the vehicle forward to push her out of the way and "revved back and forth to jolt [her] off" as she clung to the rear spoiler of his car. The State proffered Officer McDonnell to corroborate G.M.'s testimony regarding the March 14 incident.

The State presented two experts. Dr. Matthew Guller, a licensed psychologist and board-certified police psychologist who performed a Fitness for Duty (FFD) evaluation on F.M. following the March 14 incident, concluded that F.M. was not fit for full duty and recommended that he be disarmed because he was a "danger[] to himself or others." Dr. Lewis Schlosser, also a licensed psychologist, concluded that F.M. was "psychologically impaired for the role of a municipal police officer and, therefore, not fit for duty." Dr. Schlosser acknowledged that he had not performed an evaluation on whether F.M. should possess a personal firearm, "but in light of the events in the record, [he] would have concern for [G.M.] should [F.M.] have a private firearm."

The Family Part judge denied the State's forfeiture motion, relying in part on his "feel for [this case]" based on prior proceedings and "conversations and consultations" with other judges before whom the parties appeared. In addition, the court reasoned that the experts' personality profile merely described "subclinical personality styles and

tendencies," which did not amount to clinical mental illness or a personality disorder. The court ordered the return of F.M.'s weapon and identification card, while granting the State's motion for a stay pending appeal.

The Appellate Division affirmed, repeating the Family Part's assertion that "there was no evidence showing F.M. had ever used a firearm inappropriately" and holding that there was substantial, credible evidence to support the Family Part's determination that F.M. is not disqualified from possessing a firearm under N.J.S.A. 2C:58-3(c)(5). The appellate panel remanded the matter for the return of F.M.'s weapon and identification card, while granting the State's motion for a stay pending certification to the Supreme Court. The Supreme Court granted the State's petition for certification. 221 N.J. 565 (2015).

**HELD:** The Family Part applied an incorrect legal standard and its conclusions were not supported by substantial, credible evidence in the record. The record establishes that the return of F.M.'s personal weapon and identification card is inconsistent with N.J.S.A. 2C:58-3(c)(5) and, therefore, F.M.'s weapon and identification card are forfeited.

1. N.J.S.A. 2C:58-3(c) provides that a "person of good character and good repute in the community in which he lives" must be issued an identification card and permit, unless that person is "subject to any of the disabilities set forth [therein]." These disabilities apply to "any person where the issuance would not be in the interest of the public health, safety or welfare," and "any person whose firearm is seized pursuant to the Prevention of Domestic Violence Act of 1991 . . . and whose firearm has not been returned[.]" N.J.S.A. 2C:58-3(c)(5) and (8). N.J.S.A. 2C:58-3(c)(5) "is 'intended to relate to cases of individual unfitness, where . . . the issuance of the permit or identification card would . . . be contrary to the public interest.'" In re Osworth, 365 N.J. Super. 72, 79 (App. Div. 2003). N.J.S.A. 2C:58-3(f) provides that "[a]ny firearms purchaser identification card may be revoked… upon a finding that the holder thereof no longer qualifies for the issuance of such permit." The burden is on the State to prove, "by a preponderance of the evidence, that forfeiture is legally warranted." State v. Cordoma, 372 N.J. Super. 524, 533 (App. Div. 2004) (emphasis added). (pp. 25-28)

2. The Domestic Violence Act is intended "to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18. "Because the presence of weapons can heighten the risk of harm in an incident of domestic violence, the statute contains detailed provisions with respect to weapons." State v. Harris, 211 N.J. 566, 579 (2012). The statute authorizes the police to seize weapons when responding to a domestic violence complaint. Even if a domestic violence complaint is dismissed and the conditions abate, forfeiture may be ordered if the defendant is subject to any of the disabilities in N.J.S.A. 2C:58-3(c), which includes that defendant's possession of weapons "would not be in the interests of the public health safety or welfare." (pp. 28-32)

3. In a domestic violence forfeiture action, a Family Part judge's assessment of the parties' relationship and their history of domestic violence is generally entitled to heightened deference, but the judge's legal conclusions are not entitled to deference. Here, the Family Part judge incorrectly stated the applicable standard when he held that the State was required to prove "more than just a showing that some danger might exist." The State was required only to show by a preponderance of the evidence that F.M.'s possession would not be "in the interest of the public health, safety or welfare." Furthermore, the judge erred by interpreting N.J.S.A. 2C:58-3(c)(5) as requiring that F.M. suffer from a "disorder." F.M. may be disqualified under N.J.S.A. 2C:58-3(c)(5) because of elements of "narcissistic, anti-social, or paranoid personality disorder" as explained by Dr. Schlosser in his FFD evaluation report. (pp. 32-35)

4. The Court gives no special deference to the Family Part judge's factual findings in this case because he considered matters outside of the hearing record. Moreover, because the unchallenged expert testimony was that F.M. was not fit to possess a firearm, the judge's failure to recognize that N.J.S.A. 2C:58-3(c)(5) does not require that an individual possess a diagnosable disorder to be disqualified from possessing a gun is particularly significant. Because the Family Part applied an incorrect legal standard and its conclusions were not supported by substantial, credible evidence in the record, and because the Court finds that the return of F.M.'s personal weapon and identification card is inconsistent with N.J.S.A. 2C:58-3(c)(5), F.M.'s weapon and identification card are forfeited. (pp. 35-40)

The judgment of the Appellate Division is **REVERSED** and the matter is **REMANDED** to the Family Part for entry of an order forfeiting F.M.'s weapon and firearms purchaser identification card.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, PATTERSON, and FERNANDEZ-VINA; and JUDGE CUFF (temporarily assigned) join in JUSTICE SOLOMON's opinion.**

IN THE MATTER OF THE
APPLICATION OF THE STATE OF
NEW JERSEY FOR THE FORFEITURE
OF PERSONAL WEAPONS AND
FIREARMS IDENTIFICATION CARD[1]
BELONGING TO F.M.

Argued March 1, 2016 – Decided June 30, 2016

On certification to the Superior Court,
Appellate Division.

Erin Smith Wisloff argued the cause for
appellant State of New Jersey (Fredric M.
Knapp, Morris County Prosecutor, attorney).

Alfred V. Gellene argued the cause for
respondent F.M. (Fusco & Macaluso,
attorneys).

JUSTICE SOLOMON delivered the opinion of the Court.

In 2010, respondent F.M.'s personal firearm and firearms

purchaser identification card (identification card) were seized

pursuant to the Prevention of Domestic Violence Act of 1991,

N.J.S.A. 2C:25-17 to -35 (Domestic Violence Act).[2]  Both items

---

[1] The statute on possession and licensing of firearms, N.J.S.A.
2C:58-3, refers to an identification card required to purchase
firearms as a "firearms purchaser identification card."

[2] N.J.S.A. 2C:58-3(a) refers to permits to purchase a handgun,
which expire after ninety days.  N.J.S.A. 2C:58-3(a) and (f).  A
new permit must be obtained for each handgun purchase.  See
N.J.S.A. 2C:58-3(f).  N.J.S.A. 2C:58-3(b) refers to firearms
purchaser identification cards which are lasting and which must

1

were seized after a temporary restraining order was issued against him in protection of his wife, G.M.  Although the Family Part denied a final restraining order, the State filed a motion to forfeit F.M.'s weapon and revoke his identification card based on N.J.S.A. 2C:58-3(c)(5), contending that rearming F.M. "would not be in the interest of the public health, safety or welfare."

After conducting an evidentiary hearing, the Family Part denied the State's motion and ordered the return of F.M.'s weapon and identification card, even though the unrefuted expert testimony was that F.M. should be disarmed.  The Appellate Division affirmed and remanded the matter for the return of F.M.'s weapon.

We granted certification, at the State's request, to review the decision of the trial court and the Appellate Division that returned to F.M. his personal weapon and identification card. The State contends that the trial court ignored substantial evidence in the record to support forfeiture, and improperly relied on extra-judicial information in reaching erroneous decisions.  Based on a thorough review of this record, we agree with the State and reverse and remand to the Family Part for

---

be obtained to "acquire an antique cannon or a rifle or shotgun."

entry of an order forfeiting F.M.'s weapon and identification card.

I.

A.

The incident of domestic violence that gave rise to these proceedings occurred on March 14, 2010, after F.M. and G.M. had separated. It began when F.M. came to the marital residence to visit and go out with their children. G.M., claiming F.M. did not have visitation scheduled for that day, held on to the rear spoiler of F.M.'s automobile to prevent him from leaving with the children. The altercation was ongoing when Officer Brian McDonnell of the Morristown Police Department arrived at the marital residence on a report of domestic violence. As the officer approached, he observed F.M. pull G.M. off of F.M.'s vehicle and attempt to "throw" her, face forward, onto a four-foot stone retaining wall.

Observing injuries on G.M.'s forearm, the officer arrested F.M. for domestic violence and charged him with simple assault. As a result of that incident (the March 14 incident), G.M. obtained a temporary restraining order (TRO), and the Roseland

3

Police Department confiscated F.M.'s personal firearm and ankle knife.[3]

At the final restraining order (sometimes referred to as FRO) hearing, G.M. contended that F.M. had entered the marital residence unannounced and without her permission, in violation of a Consent Order entered into on February 17, 2010 (the Consent Order). The Consent Order provided that F.M. was not to come to G.M.'s residence without her consent, outlined F.M.'s visitation with the children, and, if visitation conflicted with F.M.'s work schedule, required the parties to arrange an alternative. In his defense, F.M. argued that G.M. had agreed to visitation on the day of the incident because F.M.'s work schedule conflicted with the regular visitation schedule. F.M. also stated that it was reasonable for him to remove G.M. from the vehicle because she was preventing him from exercising his right to visitation with his children by grabbing the rear spoiler of his car. After hearing from the parties and Officer McDonnell, the Family Part concluded that there was insufficient evidence to sustain G.M.'s application for a final restraining order. Also, the court subsequently dismissed the simple

---

[3] G.M. testified that F.M. was residing in Roseland at the time. F.M. was also employed as an officer with the Roseland Police Department.

assault charge against F.M. after he completed court-ordered counseling.

Following the dismissal of the March 2010 TRO and criminal charges against F.M., the State filed a motion to forfeit F.M.'s personal weapon and identification card.  During a hearing on the State's motion, the prosecutor advised the court that the Roseland Police Department had determined F.M. was fit for light duty only, and the judge ordered the department to retain F.M.'s personal and service weapons until further order of the court. The judge noted that it would issue a decision on the final disposition of F.M.'s personal and service weapons after he completed an approved batterer-intervention program and attended individual counseling.

F.M. completed the court-ordered batterer-intervention program and counseling[4] and, in September 2012, filed a motion seeking the return of his personal weapon.  Based on F.M.'s history of domestic violence, the State opposed the motion, arguing that returning F.M.'s weapon "would not be in the interest of public health, safety or welfare."

B.

---

[4] F.M. attended weekly psychotherapy sessions and completed a twenty-six-session program for perpetrators of domestic violence.

At the evidentiary hearing on the State's motion to forfeit F.M.'s personal weapon and identification card in March and May of 2013 (the evidentiary hearing), the State presented the testimony of G.M. and two expert witnesses. F.M. testified on his own behalf. The following procedural history and facts are gleaned from that hearing.

F.M. and G.M. were married in 1996 and had two children. During the early years of their marriage, F.M. worked for the Army at Fort Benning, Georgia. In 2001, respondent became a police officer with the Roseland Police Department where he remained employed until his termination in 2013. The marriage was marked by complaints of domestic violence until a divorce was finalized in 2011.

G.M. testified to the history of domestic violence that led up to the March 14 incident, beginning with two unreported episodes of domestic violence that allegedly occurred in 1997 and 2003. According to G.M., F.M. "sat on" her during a verbal altercation in 1997 and placed a gun to her head. She claimed she did not report the incident because she "did not want" F.M. to lose his job. G.M. also testified that, during an argument in 2003, F.M. "grabbed [her] neck," "forced [her] to the ground," "handcuffed [her] in front of [their] children," and "dragged [her] out of the room." G.M. stated that she did not

6

report this incident because she "was afraid" and "didn't know what to do."

G.M. also attested to a number of reported incidents. She stated that in December 2009, she was involved in a verbal dispute with F.M. over household finances. When she complained to F.M. that he was "verbally abusing" her and referred to documents she received from the New Jersey Battered Women's Shelter, F.M. allegedly lifted a stool as if he was going to hit her, stating "this is domestic violence." G.M. stayed at her friend's house that night, obtained a TRO the next day, and F.M. agreed to vacate the marital residence. Ultimately, the Family Part denied G.M.'s application for a final restraining order, but F.M.'s duty weapons were confiscated pursuant to the TRO, and he was assigned to desk duty with the Roseland Police Department.[5]

G.M. next described two incidents that took place in January 2010. The first incident began with a "heated argument" over the phone started by G.M. when she learned F.M. had an extramarital affair, and he refused to say where he was living. F.M. drove to the marital home, continued the argument, and at one point "clasped his hands," placed them over G.M., and told her to calm down and "keep her mouth shut." G.M. claimed she

_____

[5] Only F.M.'s service weapons were seized at the time; they were never returned.

felt intimidated and asked several times for F.M. to leave, but he refused.  G.M. then stood on a chair and told F.M. that she felt like "f***ing him up" for what he had put her through. When F.M. pretended to call the police, G.M. said "why don't you arrest me, you have done everything else to me," pulled her pants down, and asked him if he wanted to rape her too.  G.M. testified that she then slapped F.M. and grabbed him in his groin area.  According to G.M., F.M. "lifted [her] by [her] arms," "threw" her to the floor, "sat on" her, and told her to calm down.  G.M. stated that she sustained bruises on her arms as a result of this incident.

According to G.M., the next incident took place five days later while G.M. and F.M. were in a vehicle after speaking with a Division of Youth and Family Services (DYFS)[6] caseworker, with whom they met to discuss issues regarding F.M.'s nephew who was living with them at the time.[7]  According to G.M., F.M. became angry with G.M. for telling the caseworker about an incident involving his nephew that occurred earlier that week.  When they arrived at the marital home and G.M. parked in the driveway,

---

[6] The Division of Youth and Family Services was renamed the Division of Child Protection and Permanency in 2012.  See P.L. 2012, c. 16.

[7] The record does not reveal why respondent's nephew was residing with F.M. and G.M., or the nature of the issue.

F.M. took her phone and car keys, and grabbed her arm "really hard" to prevent her from leaving the car. G.M. eventually loosened herself from F.M. and went into the house; she sustained a "string of bruises" on her arms. G.M. reported those two incidents to the police and obtained a TRO against F.M.,[8] but voluntarily dismissed the TRO once the Consent Order was entered.

After explaining the above incidents, G.M. elaborated on the details of the March 14 incident, which resulted in the confiscation of F.M.'s personal weapon and identification card. According to G.M., she was awakened at about 7:00 a.m. by the sound of someone walking up the stairs, and she found F.M. in their children's bedroom. G.M. stated that F.M. did not have visitation with the children that day, and she reminded him about a DYFS caseworker's warning that the children would be taken away if domestic violence continued in the household. F.M. replied that he "didn't care."

G.M. claimed that F.M. ignored her demands to leave and walked the children to his car. G.M. called the police and

---

[8] F.M. was also charged with simple assault and false imprisonment. The criminal charges related to this incident were subsequently dismissed by a municipal court for G.M.'s failure to appear. G.M. testified that she never received any documents from the court to appear regarding the criminal charges and unsuccessfully sought to reopen the criminal complaint.

attempted to delay F.M.'s departure with the children by standing in the driveway. F.M. then pulled the vehicle forward to push G.M. out of the way, but she clung to the rear spoiler of his car. F.M. then "revved back and forth to jolt [her] off." After "a minute or two," F.M. turned the car's engine off, approached G.M., pulled her off of the car, carried her toward a four-foot stone retaining wall, and attempted, unsuccessfully, to "throw" G.M. over the wall. When G.M. saw Officer McDonnell arrive at the scene, she "kind of black[ed] out."

The State proffered Officer McDonnell to corroborate G.M.'s testimony regarding the March 14 incident, and the judge incorporated into the record of the evidentiary hearing, by reference, the officer's testimony from the FRO hearing, which the judge had also presided over. Officer McDonnell's testimony at the FRO hearing reveals that he was dispatched to the marital residence on a report of domestic violence. As the officer approached, he observed G.M. "grabbing on the back of [F.M.'s] car." F.M. was "standing behind her, grabb[ing] her by her arms[, and] pulling her off the back of his vehicle towards the sidewalk." The officer then observed F.M. "push [G.M.], throw her on [a three or four foot stone retaining] wall," "face forward." F.M. "turned around and started walking away," while G.M. "was standing there . . . yelling back[.]" During cross-

10

examination, Officer McDonnell testified that he did not observe F.M. "throw her to the ground, punch, [or do] anything excessive," and further noted that F.M. complied with every order the police made at the scene. However, upon observing scratches on G.M.'s forearms, the officer arrested F.M. for domestic violence and charged him with simple assault. A TRO was issued, and F.M.'s personal firearm and ankle knife were confiscated.[9]

The State next presented the testimony of Dr. Matthew Guller, a licensed psychologist and board-certified police psychologist who performed a Fitness for Duty (FFD) evaluation on F.M. following the March 14 incident.[10] Dr. Guller interviewed F.M. to evaluate his "personality traits," and administered various psychological tests, including the Shipley Institute of Living Scale, which measures the presence or absence of major mental illnesses, and the Minnesota Multiphasic Personality Inventory – 2 (MMPI2), which measures the subject's personality traits and psychopathology. As part of F.M.'s

---

[9] It is unclear from the record whether F.M.'s ankle knife was ever returned to him. That issue is not before the Court.

[10] An FFD evaluation is administered by psychologists to determine whether a police officer is psychologically impaired such that he or she is unable to continue working as a police officer. F.M. was subjected to three separate evaluations before being terminated from his position as a police officer in April 2013.

evaluation, Dr. Guller also interviewed G.M., found her account of the incidents involving F.M. "generally credible," and testified that the interview with her "did not raise concerns about [F.M.'s] serious violent propensities" because G.M. raised several collateral issues about F.M. Nevertheless, Dr. Guller noted his apprehensions about the physical nature of the restraints F.M. imposed on G.M. during the incidents.

After reviewing the results of the psychological tests performed, his interviews with F.M. and G.M., prior restraining orders, a prior FFD evaluation,[11] internal affairs records, and other police reports, Dr. Guller concluded that F.M. was not fit for full duty and recommended that he be disarmed because he was a "danger[] to himself or others." Dr. Guller explained that his conclusions were based on F.M.'s "consistent pattern of failing to deescalate or back out of volatile situations with his wife" and his "pervasive need to be right." Dr. Guller was particularly concerned that F.M. admitted to physically restraining G.M. and that "he was just unable to deescalate and walk away from a heated situation." As a result of this evaluation, Dr. Guller recommended that F.M. undergo weekly one-

---

[11] Defendant was referred for the first FFD evaluation in 2007 based on an allegation of abuse by G.M. Dr. Leslie Williams conducted the evaluation and concluded that F.M. was fit for duty at the time. The Roseland Police Department allowed F.M. to rearm after he completed recommended therapy sessions.

on-one counseling for at least four months and enroll in a twenty-six-week domestic violence program.

Dr. Guller testified that F.M. was advised "in no uncertain terms that he must make arrangements for visitation and other details of his marital affairs so that he has no further confrontations with his wife requiring police response." Dr. Guller noted in the FFD evaluation report that the Roseland Police Department "should consider serious administrative action up to and including termination" if F.M. becomes involved in further incidents of domestic violence requiring police intervention. Dr. Guller's credibility and qualifications were not questioned, and his testimony was unrefuted.

Dr. Lewis Schlosser was the second expert to testify on behalf of the State. Dr. Schlosser, also a licensed psychologist devoted to evaluating police officers' fitness for duty, explained that F.M. was referred to him for a third FFD evaluation in May 2012 following F.M.'s "several incidents with [G.M.], which call[ed] in[to] question his judgment, impulse and anger control." Those incidents occurred five months after the March 2010 evaluation by Dr. Guller, and included a dispute with G.M. over the location of their custody change which necessitated police intervention, and an incident at the children's bus stop where F.M. grabbed his daughter's backpack

13

from G.M. and yelled at her.[12]  In addition, F.M. had been charged at work with insubordination and falling asleep at his post.

Dr. Schlosser administered several psychological tests and concluded in his report, which he testified about and which was admitted into evidence, that, "[w]hile there is insufficient evidence to conclude that [F.M.] exhibits a narcissistic, anti-social, or paranoid personality disorder, he does appear to exhibit elements of these personality disorders, which have a significant negative impact on his ability to effectively perform his duties as a police officer."  More specifically, Dr. Schlosser explained in the report that F.M. had problems trusting others, and suffered from "a nearly paranoid sense that everyone was out to get him, poor impulse control, poor anger control, and poor judgment."  He also indicated that the results of the psychological testing and his interview with F.M. showed that F.M. "did not accept any responsibility for the problems in his life."  Dr. Schlosser also questioned F.M.'s credibility, noting that F.M. initially denied being involved in any incidents since his 2010 arrest, but admitted to "restrain[ing]" G.M. on two occasions after he was presented with "collateral

---

[12] Even though these incidents appear to bolster G.M.'s contentions, they were not referred to by G.M. in her testimony at the evidentiary hearing.

14

information." Dr. Schlosser noted that, when asked about disciplinary actions at work, F.M. reported the insubordination charge only and claimed that the Chief of the Roseland Police Department was "lying" about F.M.'s falling asleep at his post.

Dr. Schlosser also interviewed G.M. over the telephone for the limited purpose of verifying her account of the two incidents that occurred after the March 2010 FFD evaluation.

Dr. Schlosser concluded, based on the entirety of the evidence he reviewed, that F.M. was "psychologically impaired for the role of a municipal police officer and, therefore, not fit for duty." Dr. Schlosser indicated in the FFD evaluation report that the past eighteen months of psychotherapy had not helped F.M. change his ways of interacting with his ex-wife or his fellow officers and superiors, and F.M. "demonstrated a consistent pattern of problematic functioning that is of sufficient magnitude to find F.M. impaired and unlikely to be restored to duty in a reasonable period of time."

In particular, Dr. Schlosser stated his belief that the "public would be in danger if [F.M.] continued to work as a police officer because of [his] need to be right and his seemingly paranoid ideation." Dr. Schlosser testified that he was "frightened" by the idea of a citizen interacting with an officer who "is paranoid, thinks people are out to get [him], and who engages in impulsive bad judgments that lead to more

15

violence." Dr. Schlosser noted that, even if G.M. engaged in provocative behavior, it did not excuse the actions of F.M., who was clearly warned by Dr. Guller that there could not be further negative interactions with G.M.

When asked by the court if he had an opinion on whether F.M. should possess a personal firearm, Dr. Schlosser acknowledged that he had not performed an evaluation on that particular issue, "but in light of the events in the record, [he] would have concern for [G.M.] should [F.M.] have a private firearm." Like Dr. Guller, Dr. Schlosser's credibility and qualifications were not challenged, and his testimony was unrefuted.

Finally, F.M. testified. He denied ever pointing a firearm at or threatening to use a firearm against G.M., and he stated that he did not remember any of the other incidents about which G.M. testified. However, he was able to relate an incident in August 2010 in which he obtained an FRO against G.M. He testified that G.M. brought the children to the Roseland Police Department at his request and while he was on duty, and then argued with F.M. because he refused to tell her who would be watching the children until he completed his shift. F.M. said that G.M. stationed herself outside police headquarters and even called his supervisors. As a result of that incident, the

16

Family Part[13] found that G.M.'s conduct amounted to harassment within the meaning of N.J.S.A. 2C:33-4(c), by engaging in a "course of alarming conduct" with the "purpose to alarm or seriously annoy" her estranged husband, and granted F.M. a final restraining order against G.M. The Appellate Division reversed the grant of a final restraining order in an unpublished opinion issued in September 2011, finding that there was insufficient evidence to show G.M. committed an act of harassment. The Appellate Division saw "nothing unusual in [G.M.'s] appeal to [F.M.] as a bystander to obtain the requested information. Although [G.M.'s] calls to other superior officers are perhaps less justified, [there was] no evidence that those calls were motivated by a purpose to harass [F.M.], rather than by the desire to obtain withheld child custody and childcare information to which [G.M.] was entitled."

C.

Following the evidentiary hearing, the Family Part judge denied the State's forfeiture motion. The judge declared that he had "ascertain[ed a] feel for [this case]" because he had presided over prior divorce and domestic violence proceedings involving F.M. and G.M., and "had conversations and consultations with colleagues" who heard divorce proceedings or

---

[13] This matter was heard by a different Family Part judge.

17

worked on the domestic violence complaint filed by F.M. against G.M.  The court then addressed whether F.M. was entitled to the return of his weapon and identification card.

First, the court interpreted New Jersey jurisprudence and "various Supreme Court cases," including District of Columbia v. Heller, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), to "stand for the proposition that a limit on a citizen's right to bear arms is a Constitutional limit, and has to rest on . . . more than just a showing that some danger might exist."  Thus, the judge concluded, a "difficult and tumultuous" marriage and divorce proceedings were not an adequate basis to deny F.M.'s constitutional right to bear arms:

> One could make the argument, although ultimately would have to be rejected, that . . . everybody going through a difficult, or bitter, or protracted, or highly contested divorce case should be disarmed.  I don't think that . . . would stand Constitutional scrutiny.

The judge also found that G.M.'s "concerns, fears, and experiences with [F.M.] . . . [were] not . . . completely credible or reliable as a basis of judgment," because she went through contested and bitter divorce proceedings and "was disappointed with the custodial rulings and arrangements," which "colored her perception and articulation of what had happened and what might be expected in the future."  In particular, the court discredited G.M.'s testimony regarding the unreported

18

domestic violence incidents in 1997 and 2003.  As to the reported incidents, the judge found that the Appellate Division's September 2011 decision "capture[d] in many ways the conflicts between" F.M. and G.M.,[14] and "determined that the type of trouble they had . . . although fairly acute and unfortunate still did not rise to the level of domestic violence."  The court further stated that "when certain people have certain personality styles the resistible [sic] force meets the immoveable object."

With respect to the expert opinions that raised concerns about rearming F.M., the court found that F.M.'s personality profile, as developed by the experts, was not an adequate basis to disqualify F.M. from repossessing his weapon.  The court reasoned that the experts evaluated whether F.M. was fit for duty as a police officer, not whether his right to bear arms should be restricted, and the personality profile merely described "subclinical personality styles and tendencies," which did not amount to clinical mental illness or a personality disorder.  Additionally, the judge found that there was no evidence that F.M. had "ever been shown to use a weapon

---

[14] However, in September 2011, the Appellate Division dismissed the final restraining order obtained by F.M. against G.M. based on an allegation of harassment in August 2010.  The panel concluded that there was insufficient evidence to support the entry of the final restraining order.

19

inappropriately," and that the finalization of divorce proceedings would reduce the occasion for conflict between F.M. and G.M.

The judge also rejected the experts' finding that G.M. was credible, noting the experts "did not have the same exposure" to the parties' disputes as he did, "and don't have the same experience as a Family Court Judge." The judge referred to the fact that an FRO was issued against G.M. in connection with the August 2010 incident where G.M. contacted F.M. and his superiors at work, and concluded that F.M. cannot be held responsible for the incidents that required police intervention when G.M. instigated the disputes.

> [W]hen there is this level of conflict between divorcing parents and one of the parties is at risk regarding his position in employment if certain things happen, it provides a motivation for an adversarial party.

Based on these findings, the court ordered the return of F.M.'s weapon and identification card, while granting the State's motion for a stay pending appeal. See R. 2:9-5. The Appellate Division affirmed the Family Part's decision to deny the State's forfeiture motion.

The appellate panel repeated the Family Part's assertion that "there was no evidence showing F.M. had ever used a firearm inappropriately," and held that there was substantial, credible evidence to support the Family Part's determination that F.M. is

20

not disqualified from possessing a firearm under N.J.S.A. 2C:58-3(c)(5). The panel determined that the Family Part properly found that F.M. was not diagnosed with a disorder; that F.M.'s "outbursts" were due to frustration with the marital break-up, as opposed to a propensity for violence; and that the experts failed to consider G.M.'s role in fueling the parties' conflicts. Concerning the State's contention that the Family Part failed to consider the March 14 incident, which was witnessed and largely corroborated by Officer McDonnell, the Appellate Division explained that the Family Part was not required to specifically comment on Officer McDonnell's account of the incident, and that the officer's testimony "did not indicate that [F.M.] did anything excessive to G.M." Accordingly, the panel remanded the matter for dissolution of the stay and return of F.M.'s weapon and identification card, while granting the State's request to stay the return of F.M.'s weapon and identification card pending resolution by this Court.

This Court granted the State's petition for certification. 221 N.J. 565 (2015).

II.

The contentions of the parties relevant to this appeal are as follows. The State claims the correct standard governing the forfeiture of F.M.'s weapon and identification card under N.J.S.A. 2C:58-3(c)(5) is not whether F.M. had been diagnosed

21

with a disorder or ever used a firearm inappropriately, but whether his possession of a firearm "would not be in the interest of the public health, safety or welfare." The State emphasizes that its burden of proof to disqualify F.M. from possession of a weapon under N.J.S.A. 2C:58-3(c)(5) is "not a great one," but a mere preponderance of the evidence. State v. Cordoma, 372 N.J. Super. 524, 533 (App. Div. 2004). The State thus argues that the Appellate Division gave undue deference to the Family Part's determinations, relying only on the fact that the seizure of F.M.'s weapon and identification card was related to a domestic violence matter. Furthermore, the State contends that the Family Part's factual findings and legal conclusions, which were adopted by the Appellate Division, were "manifestly unsupported by . . . the competent, relevant, and reasonably credible evidence" in the record. The State points out that the experts analyzing F.M.'s fitness for duty raised concerns about F.M. possessing a firearm and recommended disarming him. The State also notes that the Family Part failed to make any credibility determinations regarding F.M., even though Dr. Schlosser testified that F.M. did not truthfully recount the incidents with G.M. until he was presented with "collateral information."

F.M. asserts that the Family Part's findings should be examined under the highly deferential standard of review

22

ordinarily granted to the Family Part because this case necessarily involves an evaluation of the underlying domestic relationship between F.M. and G.M. F.M. also claims that the Second Amendment to the United States Constitution, and the Supreme Court's decision in Heller, supra, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637, require the State to demonstrate "more than a mere showing that some danger might exist" before it infringes upon his constitutional right to bear arms. Finally, F.M. argues that the evidence in the record supports the Family Part's conclusions because G.M.'s testimony was the only factual evidence that the alleged incidents of domestic violence occurred, a "majority" of which were never reported to police, and none of the reported incidents resulted in a final restraining order against F.M. He points out that the only final restraining order ever issued was, in fact, issued against G.M.[15]

### III.

### A.

We begin our discussion of the law governing forfeiture of firearms and identification cards in an action under the Domestic Violence Act by recognizing the scope of our appellate review. Because "a judicial declaration that a defendant poses

---

[15] As explained at footnote 14, above, in September 2011, the Appellate Division vacated this FRO for insufficient evidence.

a threat to the public health, safety or welfare involves, by necessity, a fact-sensitive analysis," Cordoma, supra, 372 N.J. Super. at 535, "an appellate court should accept a trial court's findings of fact that are supported by substantial credible evidence." In re Return of Weapons to J.W.D., 149 N.J. 108, 116-17 (1997) (citing Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 607 (1989)). Further, this Court has "vested great discretion in our Family Part judges . . . [because] they are judges who have been specially trained" in family matters, and this Court "recognize[s] that their findings are entitled to deference." J.D. v. M.D.F., 207 N.J. 458, 482 (2011) (internal citation omitted).

Therefore, "we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974). "In those circumstances solely should an appellate court 'appraise the record as if it were deciding the matter at inception and make its own findings and conclusions.'" State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).

However, questions of law are reviewed de novo. Gere v. Louis, 209 N.J. 486, 499 (2012). The legal determinations of

24

the Family Part and Appellate Division are not entitled to any special deference. Ibid.

B.

Turning specifically to the law governing forfeiture of weapons and identification cards, the right to bear arms under the Second Amendment to the United States Constitution is subject to reasonable limitations. Heller, supra, 554 U.S. at 626, 128 S. Ct. at 2816-17, 171 L. Ed. at 678 (holding that "[l]ike most rights, the right secured by the Second Amendment is not unlimited"). The police power of the state provides our Legislature with the authority to regulate firearms and establish such "reasonable limitations" on their ownership. McDonald v. City of Chicago, 561 U.S. 742, 901, 130 S. Ct. 3020, 3095, 177 L. Ed. 2d 894, 997 (2010) ("[T]he very text of the Second Amendment calls for regulation, and the ability to respond to the social ills associated with dangerous weapons goes to the very core of the States' police powers."); see also Crespo v. Crespo, 201 N.J. 207, 210 (2010) ("[T]he right to possess firearms clearly may be subject to reasonable limitations.").

In that regard, the Legislature, in the exercise of its authority to regulate firearms, has required an individual seeking to purchase a handgun in New Jersey to first apply for an identification card and permit. N.J.S.A. 2C:58-3(a) and (b);

25

N.J.A.C. 13:54-2.2.  N.J.S.A. 2C:58-3(c) provides that a "person of good character and good repute in the community in which he lives" must be issued an identification card and permit, unless that person is "subject to any of the disabilities set forth [therein]."  See also N.J.A.C. 13:54-1.5 (stating same).  These disabilities apply to "any person where the issuance would not be in the interest of the public health, safety or welfare," and "any person whose firearm is seized pursuant to the Prevention of Domestic Violence Act of 1991 . . . and whose firearm has not been returned[.]"  N.J.S.A. 2C:58-3(c)(5) and (8)[16]; see also N.J.A.C. 13:54-1.5(a)(5).  "[T]he statutory design is to prevent firearms from coming into the hands of persons likely to pose a danger to the public."  State v. Cunningham, 186 N.J. Super. 502, 511 (App. Div. 1982).

N.J.S.A. 2C:58-3(c)(5), the "public health, safety or welfare" disqualifier, "is 'intended to relate to cases of individual unfitness, where, though not dealt with in the specific statutory enumerations, the issuance of the permit or identification card would nonetheless be contrary to the public interest.'"  In re Osworth, 365 N.J. Super. 72, 79 (App. Div. 2003) (quoting Burton v. Sills, 53 N.J. 86, 91 (1968), appeal dismissed, 394 U.S. 812, 89 S. Ct. 1486, 22 L. Ed. 2d 748

_____

[16] Other disabilities listed under N.J.S.A. 2C:58-3(c)(1)-(9) are not pertinent to this appeal.

26

(1969)), certif. denied, 179 N.J. 310 (2004).  That subsection and N.J.S.A. 2C:58-3(c)(8), regarding seizure of firearms and identification cards under the Domestic Violence Act, have been upheld against Second Amendment challenges.  See Crespo, supra, 201 N.J. at 209-10 (holding Domestic Violence Act constitutional because "the right to possess firearms clearly may be subject to reasonable limitations"); Burton, supra, 53 N.J. at 91 (rejecting constitutional challenge to predecessor statute to N.J.S.A. 2C:58-3(c)(5)); see also In re Winston, 438 N.J. Super. 1, 10 (2014) (holding that Heller, supra, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637, and McDonald, supra, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 do not render N.J.S.A. 2C:58-3(c)(5) unconstitutional), certif. denied, 220 N.J. 572 (2015); In re Wheeler, 433 N.J. Super. 560, 617 (App. Div. 2013) (addressing constitutionality of carry permit law).

The initial determination of whether to grant a permit or an identification card is made by the chief of police of the municipality where the applicant resides.  N.J.S.A. 2C:58-3(d).  The police chief must grant a permit and identification card "unless good cause for the denial thereof appears."  N.J.S.A. 2C:58-3(f).  Thereafter, a denied applicant may request a hearing in the Law Division.  N.J.S.A. 2C:58-3(d); N.J.A.C. 13:54-1.12(a).

27

Similarly, the procedure for revoking an identification card, which may be initiated upon application of the county prosecutor, chief of police, a police officer or "any citizen," is governed by N.J.S.A. 2C:58-3(f). That statute provides that "[a]ny firearms purchaser identification card may be revoked by the Superior Court of the county wherein the card was issued, after hearing upon notice, upon a finding that the holder thereof no longer qualifies for the issuance of such permit." N.J.S.A. 2C:58-3(f). The burden is on the State to prove, "by a preponderance of the evidence, that forfeiture is legally warranted." Cordoma, supra, 372 N.J. Super. at 533 (emphasis added).

C.

Having reviewed New Jersey's regulation of gun ownership under N.J.S.A. 2C:58-3, we consider the interplay between that statute and the Domestic Violence Act. The Domestic Violence Act is intended "to assure the victims of domestic violence the maximum protection from abuse the law can provide."[17] N.J.S.A.

_____

[17] "Domestic violence" is defined as "the occurrence of one or more of the following acts inflicted upon a person protected under this act by an adult or an emancipated minor": homicide, assault, terroristic threats, kidnapping, criminal restraint, false imprisonment, sexual assault, criminal sexual contact, lewdness, criminal mischief, burglary, criminal trespass, harassment, stalking, criminal coercion, robbery, contempt of a domestic violence order that constitutes a crime or disorderly persons offense, and any other crime involving risk of death or serious bodily injury to a person protected under the Domestic

28

2C:25-18.  In adopting the Domestic Violence Act, the Legislature made clear that "it is the responsibility of the courts to protect victims of violence that occurs in a family or family-like setting by providing access to both emergent and long-term civil and criminal remedies and sanctions, and by ordering those remedies and sanctions that are available to assure the safety of the victims and the public."  N.J.S.A. 2C:25-18.  Accordingly, this Court has liberally construed the Domestic Violence Act to achieve its purposes.  Cesare v. Cesare, 154 N.J. 394, 400 (1998).  Indeed, we have held that the Domestic Violence Act "is particularly solicitous of victims of domestic violence," as those who commit acts of violence may "have an unhealthy need to control and dominate their partners and frequently do not stop their abusive behavior despite a court order."  State v. Hoffman, 149 N.J. 564, 584-85 (1997).

"Because the presence of weapons can heighten the risk of harm in an incident of domestic violence, the statute contains detailed provisions with respect to weapons."  State v. Harris, 211 N.J. 566, 579 (2012).  The Domestic Violence Act authorizes

Violence Act.  N.J.S.A. 2C:25-19(a).  A spouse, former spouse, or any other person who is a present or former household member all qualify as protected persons.  N.J.S.A. 2C:25-19(d).  Courts are required to consider "[t]he previous history of domestic violence between the [parties], including threats, harassment and physical abuse" when determining whether domestic violence has occurred.  N.J.S.A. 2C:25-29(a)(1).

29

the police to seize weapons when responding to a domestic violence complaint:

> (1) In addition to a law enforcement officer's authority to seize any weapon that is contraband, evidence or an instrumentality of crime, a law enforcement officer who has probable cause to believe that an act of domestic violence has been committed shall:
>
> . . .
>
> (b) upon observing or learning that a weapon is present on the premises, seize any weapon that the officer reasonably believes would expose the victim to a risk of serious bodily injury. If a law enforcement officer seizes any firearm pursuant to this paragraph, the officer shall also seize any firearm purchaser identification card or permit to purchase a handgun issued to the person accused of the act of domestic violence.
>
> [N.J.S.A. 2C:25-21(d)(1)(b).]

Thereafter, the weapons are inventoried and turned over to the county prosecutor. N.J.S.A. 2C:25-21(d)(2). The weapons must be returned to the owner, unless the prosecutor makes an application for forfeiture of the weapons and identification card to "the Family Part of the Superior Court, Chancery Division." N.J.S.A. 2C:25-21(d)(3); see also M.S. v. Millburn Police Dep't, 197 N.J. 236, 248-49 (2008) (explaining process for weapons forfeiture pursuant to Domestic Violence Act); N.J.S.A. 2C:58-3(f) ("Any firearms purchaser identification card may be revoked by the Superior Court of the county wherein the card was issued, after hearing upon notice, upon a finding that

30

the holder thereof no longer qualifies for the issuance of such permit.").

Such proceedings are "summary in nature" and require the court to return the firearms and identification card if the owner is qualified:

> [I]f the court determines the owner is not subject to any of the disabilities set forth in N.J.S.A. 2C:58-3(c) and finds that the complaint has been dismissed at the request of the complainant and the prosecutor determines that there is insufficient probable cause to indict; or if the defendant is found not guilty of the charges; or if the court determines that the domestic violence situation no longer exists.
>
> [N.J.S.A. 2C:25-21(d)(3).]

Therefore, even if a domestic violence complaint is dismissed and the conditions abate, forfeiture may be ordered if the defendant is subject to any of the disabilities in N.J.S.A. 2C:58-3(c), which includes that defendant's possession of weapons "would not be in the interests of the public health safety or welfare." N.J.S.A. 2C:58-3(c)(5); see In re J.W.D., supra, 149 N.J. at 115-16; In re Z.L., 440 N.J. Super. 351, 358-59 (App. Div.) (holding forfeiture proper where police officers responded to five separate domestic disputes between defendant and wife, even though no temporary or final restraining order was ever issued), certif. denied, 223 N.J. 280 (2015); see also In re Osworth, supra, 365 N.J. Super. at 78 ("The dismissal of

31

criminal charges does not prevent a court from considering the underlying facts in deciding whether a person is entitled to purchase a firearm.").

IV.

The foregoing legal principles guide our determination of, first, whether the correct standards were applied by the judge here in denying the State's motion for forfeiture of F.M.'s weapon and identification card. We must then examine whether the Family Part properly interpreted the scope of the "public health, safety or welfare" disqualifier under N.J.S.A. 2C:58-3(c)(5). At the same time, we must decide whether, even if the correct standards were applied, the Family Part's factual findings were so wide of the mark as to constitute error. In making this determination the Court must resolve whether to apply the heightened deference afforded to the factual findings of the Family Part when those courts address weapons forfeiture matters related to domestic violence. State v. Wahl, 365 N.J. Super. 356, 369 (2004) (deferring to fact-finding of Family Part in weapons forfeiture matter because of court's "special jurisdiction and expertise in family matters").

A.

The Domestic Violence Act vests jurisdiction in "the Family Part of the Superior Court, Chancery Division" and mandates that weapon forfeiture matters that are based on domestic violence be

32

pursued in the Family Part. N.J.S.A. 2C:25-21(d)(3). When a forfeiture action is brought because of domestic violence, that assessment necessarily involves an evaluation by the Family Part judge of the parties' relationship and their history of domestic violence. Such evaluations are generally entitled to the heightened deference afforded to the Family Part. See Cesare, supra, 154 N.J. at 412-13.

However, the Family Part's legal conclusions are not entitled to deference. Gere, supra, 209 N.J. at 499. The judge here, relying on the Second Amendment to the United States Constitution, stated that forfeiture of F.M.'s weapon and identification card required "more than just a showing that some danger might exist." While our law governing regulation of handgun purchase and possession is circumscribed by the Second Amendment to the United States Constitution, a limitation to the right to bear arms is the "public health, safety or welfare" disqualifier. N.J.S.A. 2C:58-3(c)(5). This disqualifier requires a showing by a preponderance of the evidence that possession of a firearm by the affected individual "would not be in the interest of the public health, safety or welfare." Cordoma, supra, 372 N.J. Super. at 535; N.J.S.A. 2C:58-3(c)(5).

The Family Part here concluded that the State failed to meet its burden of proving that possession of a firearm by F.M. would not be "in the interest of the public health, safety or

33

welfare." In reaching this conclusion, the court found that: G.M. was not credible; the experts relied too heavily on G.M.'s version of events; the experts had not diagnosed F.M. with a disorder; and F.M. had never used a gun inappropriately. The Family Part also found that the divorce had been finalized, thereby reducing the occasion for conflict.

First, we note that the judge incorrectly stated the applicable standard when he held that the State, to prevail on its motion to forfeit F.M.'s weapon and identification card, was required to prove "more than just a showing that some danger might exist." In fact, the State was required only to show by a preponderance of the evidence that F.M.'s possession would not be "in the interest of the public health, safety or welfare."

Furthermore, the Family Part erred by interpreting N.J.S.A. 2C:58-3(c)(5) as requiring that F.M. suffer from a "disorder." As noted above, N.J.S.A. 2C:58-3(c)(5) is meant to address "individual unfitness, where, though not dealt with in the specific statutory enumerations, the issuance of the permit or identification card would nonetheless be contrary to the public interest." In re Osworth, supra, 365 N.J. Super. at 79 (citation and quotation marks omitted). N.J.S.A. 2C:58-3(c)(5) was not designed to disqualify only an individual who possesses a diagnosable disorder. Such mental illnesses are addressed in two separate provisions of the statute. See N.J.S.A. 2C:58-

34

3(c)(2) and (3). Thus, even though F.M. might not be disqualified from possessing a firearm under N.J.S.A. 2C:58-3(c)(2) or (3), he may nonetheless be disqualified under N.J.S.A. 2C:58-3(c)(5) because of, for example, elements of "narcissistic, anti-social, or paranoid personality disorder" as explained by Dr. Schlosser in his FFD evaluation report.

B.

Having determined that the Family Part interpreted N.J.S.A. 2C:58-3(c)(5) too narrowly and incorrectly stated the applicable standard, we turn to the court's factual determinations. To begin with, evidence not part of the Family Part record may not be relied upon in making a factual determination. Here, the Family Part judge acknowledged that he "ascertain[ed a] feel for [this case]," in part, because he "had conversations and consultations with colleagues" who were working on the divorce proceeding or worked on the domestic violence complaint filed by F.M. against G.M. Those considerations that were not part of the hearing record should not have played any part in the judge's decision. Because matters outside of the hearing record were considered and relied upon in reaching his conclusions, we give no special deference to the Family Part judge's factual findings here.

Moreover, the judge's failure to recognize that N.J.S.A. 2C:58-3(c)(5) does not require that an individual possess a

35

diagnosable disorder to be disqualified from possessing a gun is particularly significant, because the unchallenged expert testimony by Drs. Guller and Schlosser was that F.M. was not fit to possess a firearm because he failed to disengage from "heated situations," avoided taking responsibility for his actions, and had poor impulse and anger control. Nevertheless, the judge, without assessing the credibility or contentions of F.M., rejected the experts' opinions, reasoning that: (1) the experts relied too heavily on G.M.; (2) their evaluations focused on whether F.M. was fit for duty, as opposed to his general right to possess a firearm; and (3) F.M.'s personality did not suggest that F.M. had ever used a gun inappropriately.

Even though their evaluations were dedicated to whether F.M. was fit to be a police officer, the determinations of Drs. Guller and Schlosser necessarily involved considering whether F.M. was fit to possess a weapon. Dr. Guller concluded that F.M. was not fit for full duty and recommended that he be disarmed because he was a "danger[] to himself or others." Also, rearming F.M. concerned Dr. Schlosser, in part, because F.M. had little chance of recovery given the amount of therapy he had received since 2007. Dr. Schlosser specifically opined that "in light of the events in the record, [he] would have concern for [G.M.] should [F.M.] have a private firearm." Indeed, F.M.'s psychological profile, as testified to by Drs. Guller and

36

Schlosser, suggested that F.M. could use a weapon inappropriately and was not fit to possess a firearm.

The statute as written does not require the court to wait for an individual to use a weapon inappropriately before ordering forfeiture. Such a result would be contrary to the objective of the Domestic Violence Act to provide the maximum amount of protection to victims of domestic violence, and "the statutory design . . . to prevent firearms from coming into the hands of persons likely to pose a danger to the public." Cunningham, supra, 186 N.J. Super. at 511.

As a final point regarding the experts' opinions, they were not based solely on G.M.'s allegations of domestic violence. Indeed, Dr. Schlosser interviewed G.M. only for the limited purpose of verifying her account of the two incidents that occurred after the March 2010 FFD evaluation. Additionally, while Dr. Guller noted his apprehensions about the physical nature of the restraints F.M. imposed on G.M. during the incidents, and found G.M.'s account of the incidents involving F.M. "generally credible," her interview did not cause concerns about "[F.M.'s] serious violent propensities" because G.M. cited collateral issues about F.M. Each expert testified that G.M.'s interview was but one piece in their evaluation. The unmistakable conclusion is, therefore, that the experts did not rely greatly on G.M.'s accounts. Rather, each expert testified

37

that the totality of the circumstances, including their own testing and individual assessments of F.M., as well as F.M.'s account of the domestic violence incidents, were taken into account.

Moreover, in pondering "the personality constellation of the other parties" in "bitter divorce cases," and finding that "when certain people have certain personality styles the resistible [sic] force meets the immoveable object," the violent incidents between F.M. and G.M. were relegated to mere personality differences. The focus of the Family Part should have been on whether F.M.'s subclinical impairments made him unfit to possess a firearm, and whether such possession is contrary to "the public health, safety or welfare," N.J.S.A. 2C:58-3(c)(5). But, there was no discussion by the Family Part judge of F.M.'s credibility, his role in these violent incidents, or his mental state. Instead, the judge chose to focus on G.M.'s conduct which, while relevant to determining whether acts of domestic violence took place against her and important to give context to the incidents, was not controlling of whether F.M. was fit to possess a firearm.

As to the recollections of G.M., which did not weigh heavily in the experts' determinations and were dismissed by the Family Part judge, there is no explanation of why the judge chose to disregard G.M.'s account of the March 14 incident outside of

38

the marital residence when Officer McDonnell was a witness to the incident and largely corroborated G.M.'s testimony. Cf. In re Z.L., supra, 440 N.J. Super. at 358-59 (upholding weapons forfeiture proper where police officers responded to five separate domestic disputes between defendant and wife, even though no temporary or final restraining order was ever issued). The Family Part instead found that the parties' conflicts "did not rise to the level of domestic violence," relying upon the Appellate Division's discussion in its September 2011 decision vacating an FRO granted to F.M. However, the Appellate Division never made a finding that there was no domestic violence between F.M. and G.M. Indeed, the panel only found that the evidence was not sufficient to establish that G.M. was guilty of harassment in August 2010.

As such, the Family Part's conclusions are "manifestly unsupported by the competent, relevant and reasonably credible evidence" of record and, indeed, the substantial, credible evidence in the record, including the unrefuted testimony and reports of the State's experts, Drs. Guller and Schlosser, compels a contrary result in the "interests of justice." Rova Farms, supra, 65 N.J. at 484. Therefore, because an incorrect legal standard was applied by the Family Part, its conclusions were not supported by substantial, credible evidence in the record, and because we find that the record establishes that the

39

return of F.M.'s personal weapon and identification card is inconsistent with <u>N.J.S.A.</u> 2C:58-3(c)(5), we exercise our original jurisdiction to make the findings necessary to conclude this matter, and hold that F.M.'s weapon and identification card are forfeited.

V.

For the reasons set forth above, the judgment of the Appellate Division is reversed, and the matter is remanded for entry of an order forfeiting F.M.'s weapon and firearms purchaser identification card.

CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, PATTERSON, and FERNANDEZ-VINA; and JUDGE CUFF (temporarily assigned) join in JUSTICE SOLOMON's opinion.