838 A.2d 465 (2003)
365 N.J. Super. 72
In the Matter of Appeal of Denial of Permit to Purchase a Handgun by Daniel OSWORTH.[1]
Superior Court of New Jersey, Appellate Division.
Submitted October 28, 2003.
Decided November 24, 2003.
*466 DeCotiis, FitzPatrick, Cole & Wisler, Teaneck, for appellant Franklin Township (Daniel J. FitzPatrick, of counsel; Judy Yi, on the brief).
Edward J. Zohn, Somerville, for respondent Daniel Osworth.
Before Judges COBURN, WELLS and FISHER.
The opinion of the court was delivered by COBURN, J.A.D.
Pursuant to N.J.S.A. 2C:58-3, Osworth applied to the Chief of Police of Franklin Township for a permit to purchase a handgun. The application was denied, and Osworth appealed to the Law Division for a hearing to review the Chief's decision. After taking testimony from Osworth and two members of the police department, the trial judge ruled in Osworth's favor and entered an order authorizing him to receive the permit. This appeal ensued. We reverse.

I  FACTS
Osworth filed his application for a permit to purchase a handgun on June 17, 2002. On September 20, 2002, the Chief marked the application disapproved, citing as his only reason "PUBLIC HEALTH, SAFETY AND WELFARE." On that date, Lieutenant Carter, the commander of the Franklin Police Departments Professional Services Division, wrote to Osworth, explaining that the Chief's "disapproval is based on the provisions of N.J.S.A. 2C:58-3c(5), which states that [no handgun purchase permit] shall be issued `to any person where the issuance would not be in the interest of the public health, safety or welfare.'" (Emphasis omitted).
Osworth appealed pro se to the Law Division. Counsel appeared for Franklin Township, and the proceeding began with the trial judge asking Osworth why he thought the Chief was mistaken. Although Osworth indicated he was unsure, he said that the Chief was probably relying on his previous indictment for firearms charges, which had been resolved by his successful participation in a pretrial intervention *467 program in Hunterdon County. The trial judge then invited Franklin Township to present its evidence.
Detective Gary R. Karwoski testified first, indicating that a record check showed that Osworth, who was a federally licensed firearms dealer, had been arrested in Hunterdon County for weapons offenses on August 19, 2000. He then related that
[t]he police report indicated that Mr. Osworth was coming along a piece of property near a roadway when a West Amwell Township police officer stopped him along with, I believe, two other friends of his. They were carrying rifles, and when they were stopped, the police officer subsequently saw a bulge in, along the waist of Mr. Osworth. He then found [on Osworth] a loaded Glock... handgun, loaded with hollow point bullets.

[Emphasis added.]
According to the police report, none of the men had firearm identification cards or hunting licenses, although they claimed the owner of the land had given them permission to hunt coyotes.
Detective Karwoski added that he was also concerned about Osworth's failure to advise the Montgomery Police Department of his arrest while he had then pending in that township an application to carry a handgun. Finally he noted that the denial letter sent to Osworth at the address he had listed as his residence in his application was returned undelivered, and that further investigation revealed that there was no such address.
Lieutenant Jeffrey J. Carter, Karwoski's superior, summarized the results of their investigation, and added the following with respect to the reasons for the Chief's decision:
Based on all of that, it was the Chief of Police's decision, based on both my recommendation and that of Detective Karwoski, that under the circumstances of this case involving a federally licensed firearms dealer who applies for a carry permit, gets arrested three weeks later for possession of a handgun with hollow point bullets, who for whatever reason never brings that to the attention of Montgomery Township while they are in the process of investigating that application to carry a handgun, based on the totality of the circumstances, this is a clear case of ... not meeting the public health safety, and welfare as prescribed under the statute.
Osworth testified, indicating that when the arrest occurred he was hunting coyotes on private property with the owner's permission. He admitted that the owner's permit to hunt coyotes had not been renewed, but indicated that he did not know that at the time. Although he offered no written proof, he claimed that at the time he had written permission from the owner to "have a firearm on his land." He admitted not having his firearm identification card on his person, although he asserted it was in his nearby vehicle. He admitted possession of a rifle and of a handgun loaded with hollow nose bullets. He also admitted that he did not have a permit to carry the handgun, offering as an excuse the permission received from the owner, which he said he assumed was sufficient. With respect to the erroneous address on his application form, he offered this explanation:
As far as the address change, when I moved back to Franklin Township, I did live at Moeser Road, and it was a mistake between my landlord and myself that the address is indeed 106 not 406, and that is just due to me because it is a busy time of year for my business, and no excuse, but I'm running around like a mad man and then I am trying to move. I use a PO box for my personal mail, so *468 it wasn't all that important to me right then and there if it was 406 or 106.
He added that he had listed his business address correctly on the application.

II  LAW
N.J.S.A. 2C:58-3, which governs the purchase of firearms, is modeled on an earlier statute, N.J.S.A. 2A:151-32 to -34. The parties have assumed correctly that therefore the Court's comments on the earlier statute in Weston v. State, 60 N.J. 36, 286 A.2d 43 (1972), are applicable to the modern version.
Thus, the police investigation of the application is informal. Id. at 43, 286 A.2d at 46-7. Although the chief is not obligated to hold a "trial-type hearing," if he decides to deny the application, he should give the applicant "an opportunity... to discuss the matter [with him], to be informed of the reasons for the denial and to offer any pertinent explanation or information for the purpose of meeting the objections being raised." Id. at 43-44, 286 A.2d at 47.
On appeal to the Law Division, the hearing is de novo, which "in this context contemplates introduction of relevant and material testimony and the application of an independent judgment to the testimony by the reviewing court." Id. at 45, 286 A.2d at 47. The chief has the burden of proving the existence of good cause for the denial by a preponderance of the evidence. Id. at 46, 286 A.2d at 48. The procedure to be followed in court is this:
At the outset of the [court] hearing, therefore, orderly and logical procedure calls for introduction through the testimony of the applicant of his application for the identification card, the rejection thereof and the reasons given by the Chief, if any. At this point he may be subjected to cross-examination by counsel for the Chief. Thereafter, the Chief should proceed with the evidence on which his denial was predicated. Ordinarily, this would include presentation of his own testimony, that of the members of the police department who made the investigation and furnished reports to the Chief, any available lay or professional persons who furnished information which influenced the action taken by the Chief, and any admissible documentary evidence which played a part in the adverse decision. Upon completion of the Chief's proof, the applicant may offer relevant rebuttal testimony.
[Ibid.]
Although the decision may not rest solely on hearsay, "[t]his is not to say ... that in such a proceeding, whether administrative or on judicial review, the usual rules of evidence barring hearsay testimony should be regarded as controlling." Id. at 50, 286 A.2d at 50.
The dismissal of criminal charges does not prevent a court from considering the underlying facts in deciding whether a person is entitled to purchase a firearm or recover one previously taken by the police. In re Return of Weapons to J.W.D., 149 N.J. 108, 110, 693 A.2d 92, 93 (1997); State v. One Marlin Rifle, 319 N.J.Super. 359, 371, 725 A.2d 144, 149-150 (App.Div.1999); State v. Freysinger, 311 N.J.Super. 509, 513-17, 710 A.2d 582, 584-86 (App.Div. 1998); State v. Cunningham, 186 N.J.Super. 502, 504-508, 453 A.2d 239, 239-242 (App.Div.1982). Although none of those cases involved dismissal of the charges following successful participation in a pretrial intervention program, there is nothing in the pretrial intervention statute, N.J.S.A. 2C:43-12 to -22, which prevents application of the same rule in this context. We recognize, of course, that N.J.S.A. 2C:43-13(f) provides in pertinent part that *469 "[n]o statement or other disclosure by a participant undergoing [pretrial intervention] supervisory treatment made or disclosed to the person designated to provide such supervisory treatment shall ... be admitted as evidence in any civil ... proceeding...." However, in this case no such statement or disclosure was offered. Rather, the Chief relied on the police reports of the incident, which were related to the trial court, as were Osworth's own admissions respecting his conduct on the day of his arrest, which corroborated the chief's evidence.
N.J.S.A. 2C:58-3c provides that a handgun permit or firearms purchaser identification card shall not be denied to any person of good character and good repute but that no such permit or card shall be issued to anyone within certain categories. Among those barred for specific reasons are convicted criminals, N.J.S.A. 2C:58-3c(1), and "any person who knowingly falsifies any information on the application form for a handgun purchase permit or firearms purchaser identification card[.]" N.J.S.A. 2C:58-3c(3).
The statute also provides that no permit or card shall be issued "[t]o any person where the issuance would not be in the interest of the public health, safety or welfare[.]" N.J.S.A. 2C:58-3c(5). As was the case under the identical language of the former statute, this provision is "intended to relate to cases of individual unfitness, where, though not dealt with in the specific statutory enumerations, the issuance of the permit or identification card would nonetheless be contrary to the public interest." Burton v. Sills, 53 N.J. 86, 91, 248 A.2d 521, 523 (1968), appeal dismissed, 394 U.S. 812, 89 S.Ct. 1486, 22 L.Ed.2d 748 (1969); State v. Cunningham, supra, 186 N.J.Super. at 507, 453 A.2d at 241.
The meaning of "public health, safety or welfare" in subsection 3c(5) was explored in the following cases: in Cunningham, we observed that intentional wrongdoing or negligence in the handling of a weapon could support denial of a permit, 186 N.J.Super. at 507, 453 A.2d at 241; in In re Sbitani, 216 N.J.Super. 75, 522 A.2d 1041 (App.Div.1987), we indicated that conviction of certain disorderly persons offenses, including assault, could lead to denial of a permit, id. at 78, 522 A.2d at 1042; and in State v. Frey singer, supra, while upholding the gun forfeiture, we said this:
There was sufficient proof ... that defendant not only is an habitual drunkard but also poses a threat to the public health, safety and welfare. Defendant has two driving under the influence convictions and two convictions for refusing to submit to chemical tests. Most disturbingly, defendant admitted that he hit a pedestrian with his car but did not bother to stop. Instead, he drove straight home and went to bed. The record allows the inference that defendant may have hit his girlfriend purposefully after the two argued in the bar. This may explain his lack of concern for the person he struck. If defendant was being truthful when he stated that he did not know it was his girlfriend whom he hit, then defendant's actions demonstrate a complete disregard for the stranger he struck and left unattended in the roadway.
[311 N.J.Super. at 516-17, 710 A.2d at 585-86.]

III  DISCUSSION
Based on Osworth having given his correct business address on the application, the trial judge found that Osworth had inadvertently given the wrong address for his residence. He then concluded that the Chief of Police abused his discretion in denying the application because of his reliance *470 on the information concerning Osworth's arrest. He based that conclusion on the successful completion of the pretrial intervention program and the dismissal of the charges, which he thought barred the Chief from considering the facts underlying the charges. He also observed that Osworth had what he considered to be a legitimate argument in defense of the charges; namely, that at the time of his arrest he was on private property of another with that person's permission to carry firearms.
Although we accept the trial judge's finding that the mistaken address listing was inadvertent, and therefore not an independent ground for denial under N.J.S.A. 2C:58-3c(3), we are nonetheless satisfied that he erred in failing to consider the evidence leading to the arrest simply because Osworth had successfully completed the pretrial program, and further erred in failing to decide whether that evidence warranted denial of the permit.
The facts admitted by Osworth established by a preponderance of the evidence that on the day of his arrest he had violated, at the least, the following criminal laws: carrying a handgun without a permit, N.J.S.A. 2C:39-5b, a third-degree crime; and possession of hollow nose bullets, N.J.S.A. 2C:39-3f, a fourth-degree crime. Obviously, the permission of the property owner allowing Osworth to hunt on his property provided no justification for the violation of those statutes. N.J.S.A. 2C:39-6e; See State v. Valentine, 124 N.J.Super. 425, 307 A.2d 617 (App. Div.1973); State v. Marques, 140 N.J.Super. 363, 356 A.2d 399 (App.Div.1976). While everyone is presumed to know the law, we would certainly expect that the holder of a federal license to deal in firearms would be especially familiar with laws governing such matters. Since Osworth's application for a permit to carry a handgun was pending when he was arrested, we infer that his violation of the law against carrying without a permit was intentional. Since a criminal conviction for either of those offenses would be an automatic bar to obtaining a permit to purchase a handgun, N.J.S.A. 2C:58-3c(1), the fact of their commission, even absent conviction, warranted denial of the permit in this case under subsection c(5). In short, it does not serve public safety to issue a handgun purchase permit to someone who has demonstrated his willingness to disregard the gun laws of this State.
We conclude by noting that Osworth has not argued that he was denied due process of law by the Chief's failure to provide him with an explanation of the denial in advance of the hearing. We assume that is because it is apparent from the record that he understood that his arrest for weapons offenses was the most likely reason for the denial, and he was prepared to deal with that issue. Nonetheless, we emphasize the importance of a pre-hearing explanation from a chief of police so that the applicant has a fair opportunity to prepare his case and arrange for such witnesses as may be necessary.
Reversed.
NOTES
[1] Improperly captioned by the parties as In the Matter of Appeal of Denial of Firearms Purchaser Identification Card of Daniel Osworth.