**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3769-15T2

IN THE MATTER OF WEAPONS
SEIZED PURSUANT TO THE
PREVENTION OF DOMESTIC
VIOLENCE ACT FROM J.S.

_____

Submitted December 20, 2017 – Decided September 20, 2018

Before Judges Nugent and Currier.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Warren County,
Accusation No. 18-13-2112.

Evan F. Nappen, attorney for appellant/cross-
respondent J.S. (Louis P. Nappen, on the briefs).

Richard T. Burke, Warren County Prosecutor, attorney
for respondent/cross-appellant State of New Jersey
(Matthew P. Tallia, Assistant Prosecutor, of counsel
and on the brief).

PER CURIAM

Appellant, J.S., appeals the Chancery Division order that denied his

application for a Firearms Purchaser Identification Card (FPIC). The State

cross-appeals from the trial court's rejection of its argument that J.S. is an

alcoholic. In its decision upholding the denial of J.S.'s FPIC, the trial court took judicial notice of a critical fact without affording the parties a proper opportunity to address it.  For that reason, we reverse and remand for a new hearing.

I.

A.

This action's procedural history began in April 2013 when the Warren County Prosecutor's Office filed a petition for disposition of weapons seized in February 2013 pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35.  Two months later, in an April proceeding before the trial court, an assistant prosecutor placed on the record the parties' agreement concerning the weapons.  The parties agreed J.S. would apply for a FPIC.  J.S. applied for the FPIC.  The municipal Police Chief denied the application.  J.S. appealed to the trial court, N.J.S.A. 2C:58-3(d), and the trial court also denied the application.  This appeal followed.

B.

During the hearing in the trial court, J.S. testified to his application, its rejection, and the Police Chief's reasons for rejecting it.  The Chief testified.  In rejecting the application, he considered J.S.'s application, the investigation

report of a domestic violence incident involving J.S., and the contents of a domestic violence complaint. These documents contained the following facts.

On a February morning in 2013, at approximately 10:00 a.m., the municipal police department's Sergeant drove to J.S.'s home in response to a dispatch of a suicide threat. J.S. had left for work, but the Sergeant spoke to his wife, W.S. In light of the report of the suicidal threat and J.S. not being home, the Sergeant seized the weapons in the home for safekeeping and to prevent the parties, including J.S., from harming themselves or others. The weapons included handguns, rifles, a shotgun, a BB gun, and a compound bow.

According to the incident report, W.S., told the Sergeant her husband had been drinking a lot lately. She described one evening where she woke up to him choking her. He let her go and said, "you're lucky I let you live." The Sergeant advised her of her right to obtain a domestic violence restraining order. She filed a domestic violence complaint and obtained a temporary restraining order (TRO), but had the complaint dismissed and the order vacated eight days later.

In the domestic violence complaint, W.S. described two incidents. The first took place on a night in February 2013. J.S. allegedly "woke up three times by staring at [her] and telling her he hated her. [He] told [her] once he retired he was going to end it all." The second happened ten days earlier than the first.

3

W.S. reported that at 2:30 a.m. she "woke up with [J.S.'s] hands around her neck. He told her she was lucky she was alive.  He hated her."

On the form domestic violence complaint, in response to a question concerning previous domestic violence incidents, W.S. reported, "January 2013 [J.S.] held [her] down on the bed.  [She] couldn't get up.  [J.S.] screaming stupid bitch, [he] hated [her], continuously telling [her] Stupid bitch."

The Police Chief considering J.S.'s application was aware from speaking to J.S.'s commanding officer on a military base that J.S. had gone to a hospital. When the Chief testified, he could not recall the details of his conversation with J.S.'s commanding officer.  The Chief said he had attempted unsuccessfully to obtain records from the hospital.

According to the Chief, the two references listed by J.S. in his FPIC application "checked out," that is, the references did not indicate anything negative in the questions they answered.  One question was whether J.S. was "known to be an alcoholic."  Additionally, an inquiry to the County Adjuster's office revealed no record of J.S.'s commitment, admission, or treatment for mental health issues.  But the Chief knew J.S. had completed a twenty-eight day in-patient program for alcohol abuse.  The Chief was looking for documentation

4

from the in-patient program that said J.S. was not an alcoholic. He could not obtain the records.

The Chief denied J.S.'s application for several reasons. First, based on the incident report suggesting J.S. was suicidal and the domestic violence complaint, the Chief determined the issuance of the FPIC would not be in the interest of the public health, safety, and welfare. Next, the Chief had no supporting documentation, particularly a diagnosis, for either J.S.'s hospitalization or his in-patient admission, though he admitted he never asked J.S. to provide these medical documents, and in hindsight, he probably should have. Last, J.S. did not disclose on the written application that he had been hospitalized or observed for a mental or psychiatric condition. The Chief conceded, however, the questions requesting such information were ambiguous.

W.S. testified about her marriage and the February 2013 incident. She and J.S. had been married eighteen years. She had three children, one with J.S., two from a previous marriage. She suffered from a condition she described as hydrocephalus, which sometimes affected her memory.

On a February night in 2013, two of her daughters woke her. J.S. came into the room and he was angry, "cussing at [her] and calling her names." He had been drinking vodka and was intoxicated. J.S. left the room, and W.S.

5

telephoned her brother-in-law to see if anything had happened in the family. During the conversation, J.S. returned. W.S. put the phone down but unknown to J.S. it was still connected. J.S. yelled at his wife some more and then left. His brother overheard some of the things he said.

The next morning, J.S., who was in the Navy, left to go to the base where he worked. After he left, W.S. received a telephone call from J.S.'s co-worker at the base. The co-worker said that as a result of a call from J.S.'s brother, a police officer would be coming to her house to pick up the weapons in the home. Later that morning, a uniformed police officer arrived at the house. He was looking for J.S. W.S. recalled the officer asking about what kind of vehicle J.S. drove and saying he was there to pick up all weapons. She took him around the house and showed him the weapons, which he confiscated. W.S. recalled the officer asking questions about J.S.'s temper, his drinking, and the argument.

The officer explained to W.S. that she could get a TRO that would provide for a cooling down period. The officer allegedly said the TRO would not mean anything unless she "put it as permanent."

W.S. testified she never felt she was in danger during the incident. Her husband had never done anything during the course of their marriage to make her feel she was in danger. He had never threatened her and he had never been

6

physically violent with her, nor had he ever threatened anyone else in their home. That night, when J.S. threatened to "end it all," she understood him to mean he would seek a divorce and end their marriage. She never interpreted this statement as a reference to hurting himself.

J.S. had never used his weapons in an inappropriate way. In fact, with the exception of a handgun hidden in their bedroom, J.S. kept his guns in a locked gun cabinet in the living room. He kept the ammunition, including ammunition for the gun in his bedroom, in a separate room away from the weapons. The only times W.S. recalled the guns being outside the cabinet were once when J.S. took the guns apart when they moved to a new state and once when he cleaned them. She had never felt unsafe around the guns.

W.S. denied a statement in the incident report, which she allegedly attributed to one of her daughters, that J.S. told the daughter to blow his head off. W.S. explained the daughter to whom the statement was attributed was severely handicapped. She had not spoken since age seven, except for a short period when she was twelve and began to utter two-word phases.

W.S. did say she told the officer J.S. had put his hand around her neck but denied he had ever choked her. She also confirmed J.S. woke her three times during the incident that precipitated the TRO, but she said she went back to sleep

7

after the third time. She never called the police. She also said that despite the three incidents she described in the domestic violence complaint, she never feared her husband.

J.S. had been drinking before each incident. According to W.S., he was drinking "a lot" during that period. Following the incident, J.S. went into a month-long rehabilitation program. Since then, there has been a positive change; J.S. now interacts with and enjoys the family. W.S. added that she only took out the TRO to have a cooling down period. She had the TRO dismissed approximately one and one-half weeks after obtaining it.

Since the February 2013 incident, J.S. and W.S. have qualified for in-home care for their handicapped daughter. This has significantly eased their stress and enabled them to go out occasionally. The family also has time now to go out together.

J.S. now only drinks a single beer approximately once each week. He has not been intoxicated since returning from the in-patient treatment program and he attends a meeting called "Smart Recovery" weekly.

W.S. has absolutely no concern about J.S. getting his guns back. In fact, she would like to see them returned.

A-3769-15T2

J.S. was a Chief Petty Officer during these events. His supervisor was a Master Chief stationed in Maryland. The morning after the domestic violence incident, the Master Chief received third-hand information about the incident the previous night. There appeared to be a possible threat of suicide. No guns were mentioned. Unable to reach J.S., he contacted local authorities to do a wellness check on J.S. and his family.

Further concerned because of the mention of suicide, the Master Chief had another officer meet J.S. and transport him for a mental health evaluation. J.S. was evaluated at St. Clare's Hospital and released. Although the evaluators did not find any indication of suicidal tendencies, they recommended that J.S. seek follow-up treatment for alcohol abuse.

J.S. was separated from W.S. The Master Chief drove to New Jersey, made sure J.S. had accommodations, then drove to J.S.'s home and spoke to W.S. He also recommended J.S. do a self-referral to deal with the problem at hand, even if it was not recurring. J.S. attended an in-patient program named Poplar Springs in Virginia. Upon his completion of the program, he returned to the base where he continued in a program recommended to the Master Chief by personnel at Poplar Springs. J.S. and his family also underwent family counseling.

A-3769-15T2

J.S. worked with naval weapons. The Master Chief testified J.S. had undergone training for side arms, personal weapons, and advance weapon systems.

J.S., age thirty-eight at the time of the hearing, had a "DUI" conviction when he was twenty-one. He had been in the Navy for twenty-one years before retiring in January 2014. He had handled all forms of firearms, including small arms "up to major caliber gun weapons systems," and had worked on major weapons systems. During his first fifteen years of service, he spent seventy-five percent of his time on board ships, where alcohol was not permitted.

On the night of the February 2013 incident, J.S. had been drinking vodka. He became inebriated. He and his wife had been having "typical" verbal marital conflicts about the kids, money, and other things. That night they argued about one of their daughters and said some pretty ugly things to each other. He told W.S. he hated her and called her a stupid bitch. He told her, "you act like you just want me to blow my head off or something." He also said that once he retired, he was going to end it all. He would be "out of there," that is, divorced, but would wait until he retired so that she would continue to have medical insurance.

A-3769-15T2

Later that night, he woke W.S. by touching her on the shoulder, an admittedly mean thing for him to do. He woke her simply to annoy her.

J.S. also admitted he had argued with W.S. several weeks earlier. He said some mean things he was not proud of. When W.S. fell asleep, J.S. put both hands on her shoulders to shake her and wake her. He called her more names. They both said mean things to one another that they now regret.

J.S. denied telling any of his daughters to blow his head off. They did not have access to his guns. J.S. testified he kept his guns in a locked cabinet, with the exception of one he kept in the bedroom. He also had individual gun locks for the weapons.

J.S. added that the incident report attributed this statement to their handicapped daughter. The attribution was a ridiculous assertion, because at age twenty-three his daughter functioned at the level of a six-year-old child. J.S. explained the exhaustion and stress he and his wife had experienced for the years they cared for their daughter without help.

J.S. confirmed the events that occurred after he arrived at the base the following morning, including his mental health evaluation and the recommendation that he undergo in-patient counseling for alcohol abuse. He entered Poplar Springs for a twenty-eight day program. According to J.S., when

he applied for the FPIC, he gave the municipal police chief a medical authorization to obtain the records.

The Poplar Springs medical records were entered into evidence. The discharge summary was drafted by a Dr. Suave, who did not actually work with J.S. The doctor listed the discharge diagnosis as alcohol dependence, even though J.S. had never missed work due to alcohol. The summary also listed psychological stressors as moderate. J.S. said the most severe stressor had been the constant care he and his wife gave their handicapped daughter before getting help. Since his discharge from the in-patient program, J.S. has never felt the urge or need for a drink. Now he and his wife will have a twenty-four ounce beer with dinner "a couple times a month."

J.S. and W.S. did not divorce. The family is doing much better. The help the family receives with their handicapped child has eased their stress.

J.S. described the weapons the police seized. He has owned the rifles since he was a teenager. One was a gift from his grandfather. The others were gifts from his father. He has owned some of the guns for more than twenty years, some for more than thirty years. Most have not been fired for more than eighteen years, and all are locked in a cabinet when not in use.

A-3769-15T2

The State presented the testimony of one of J.S.'s daughters, a mental health screener from St. Clare's Hospital, and a psychiatrist from St. Clare's. The daughter was the one who argued with J.S. on the night of the February 2013 incident. She had little recall of the incident. She denied her father threatened to hurt himself. She testified her parents once argued and yelled at each other, but she denied her father ever grabbed, choked, or put his hands on her mother. On cross-examination, the daughter testified she did not fear her father, had no safety concerns about his guns, and could think of no reason they should not be returned.

The health screener from St. Clare's testified she met with J.S. on the day after the incident. He was found not to be in need of hospitalization or treatment for mental health issues. The staff psychiatrist did recommend, however, he follow up with outpatient counseling for substance abuse or "AA."

The health screener telephoned W.S. after speaking to J.S. W.S. recounted the details of the previous night's incident as well as the details of an incident in January. She said J.S. had to drink to deal with his life. He had been drinking heavily the day before the incident and the day of the incident. During the February incident, W.S. said she heard him tell one of their daughters he was going to blow his brains out. He also told her he would wait until retirement to

end it all. Then he said, "better yet, why not blow my brains out and you won't get anything." He was "heavily intoxicated."

W.S. told the screener that during an incident a month earlier, she woke up, J.S. had his hands around her neck, and J.S. was yelling, "you're lucky I let you live. I hate you. I don't love you." In addition to recounting the details of these incidents, W.S. told the screener J.S. attempted suicide when he was a teenager.

St. Clare's psychiatrist testified J.S. was not in need of admission as a threat to himself or others. The psychiatrist diagnosed J.S. with alcohol dependence, but not severe dependence, and "rule[d] out" alcohol induced mood disorder. Alcohol dependence meant J.S. was abusing alcohol. The doctor made the diagnosis because J.S. was reportedly using alcohol almost daily. The doctor recommended alcohol rehabilitation. He explained that with the diagnosis of alcohol dependence, if a person stops drinking for a period of time "he still has [the] diagnosis of alcohol dependence. But we will add 'in remission.'" He also explained that alcohol dependence did not mean J.S. was an alcoholic. "Alcoholic" is not a diagnosis, but rather a non-medical term. The doctor diagnosed J.S. as a result of the history of alcohol consumption.

14

II.

Based on the foregoing evidence, the trial court concluded J.S.'s application for a FPIC should be rejected. The court noted the State had "withdrawn" its objection to J.S.'s application based on the grounds of falsification of the application and domestic violence. The State proceeded on the grounds of alcohol dependency and danger to the public safety and welfare. The court found J.S. was neither a habitual drunkard nor an alcoholic. The court did, however, determine that the issuance of a FPIC to J.S. would not be in the interest of the public health, safety or welfare.

In so finding, the court relied on facts it judicially noticed. Specifically, the court noted:

> New Jersey has implemented a Drug Court program statewide which admits both drug-addicted and alcohol-addicted criminal defendants. This court takes judicial notice of the fact that all Drug Courts operate with a policy of zero tolerance, that is, ingestion of any kind of mood-altering substance is considered a relapse and exposes the participant to sanctions. Participants are randomly and regularly tested for the presence of any such substances. There is no exception for a small amount of beer. From this policy, the court infers an acknowledgment in New Jersey that current science favors abstinence as the only acceptable response to alcohol dependence.

A-3769-15T2

The record does not reflect that the court gave the parties advance notice of its intent to take such judicial notice or provide the parties an opportunity to address the matter after issuing its written opinion.

In determining the issuance of the FPIC would not be in the interest of the public health, safety or welfare, the court's judicially noticed facts were critical. Although finding J.S. had consumed only a twenty-four ounce can of beer once a week after his rehabilitation, and now consumed a twenty-four ounce can of beer perhaps once a month, the court nonetheless found his consumption of alcohol in any amount "manifests a willfulness to defy the commonly accepted response to alcohol dependency, abstinence, even knowing that this behavior would be scrutinized when he applied to have his weapons returned." The court added, "[h]e didn't present any evidence, from Poplar Springs, his family counselor or his aftercare program, that social drinking is an acceptable aftermath to alcohol dependence." The court thus concluded:

> [T]here is too great a risk that the next time [J.S.] experiences significant stress or anger, he will drink alcohol, and if he drinks too much it will lead to further abuse of his wife. For this reason the court finds that the evidence supports the state's contention that [J.S.] currently poses a risk to the health, safety and welfare of his wife, and his application is denied.

A-3769-15T2

## III.

J.S. argues, among other things, he was denied due process because he was given no notice that the court would implicitly require complete abstinence from alcohol as a condition of the issuance of a FPIC. J.S. points out that alcohol dependency is not a statutory disqualifier. J.S. insists that the court, in effect, provided its own medical or mental health conjecture and diagnosis without any underlying expert testimony. The court did so, according to J.S., by speculating about risks based on a judicially noticed concept that is at best questionable.

J.S. also argues the court misapplied the statutory criteria concerning the issuance of FPICs when it found issuance of a FPIC to J.S. would not be in the best interest of his wife. J.S. points out the statute requires the issuance be contrary to the interest of "the public." Last, J.S. argues that the court's factual determinations about potential future events is based on sheer speculation, unsupported by expert testimony. Such a decision, argues J.S., violates his right to bear arms.

The State counters that appellant was afforded due process. The State notes appellate courts are bound by those findings of a trial court based on sufficient credible evidence in the record. According to the State, such was the case here.

 A-3769-15T2

Next, the State contends appellant was afforded due process because he had a "lengthy hearing . . . which spanned close to two years and consisted of half a dozen court dates."  The State points out that J.S. was afforded the right to call witnesses and experts.  The State claims J.S. did not raise any other due process concerns before the trial court.  The State also responds that J.S.'s constitutional arguments are contrary to settled law.

In its cross-appeal, the State argues the trial court erred in not considering its argument that J.S. is an alcoholic.  The State, in effect, contends the record supports its argument.  J.S. disputes the trial court erred when it found he was not an alcoholic.

IV.

A.

The parties agreed that J.S. would be required to obtain a FPIC before the State returned his weapons.  The parties further agreed the relevant section of the statute provides:

> Who may obtain.  No person of good character and good repute in the community in which he lives, and who is not subject to any of the disabilities set forth in this section or other sections of this chapter, shall be denied a permit to purchase a handgun or firearms purchaser identification card, except as hereinafter set forth.

18

[N.J.S.A. 2C:58-3(c).]

This statutory subsection specifies nine disqualifying criteria. Disqualified persons include alcoholics and persons to whom "the issuance would not be in the interest of the public health, safety or welfare." N.J.S.A. 2C:58-3(c)(3) and (5).

B.

The judicial hearing following an applicant's appeal of a Police Chief's denial of a FPIC is "de novo." In re Dubov, 410 N.J. Super. 190, 200 (App. Div. 2009) (quoting Weston v. State, 60 N.J. 36, 45 (1972)). The Chief of Police has the burden of proving by a preponderance of the evidence "the existence of good cause for the denial." In re Osworth, 365 N.J. Super. 72, 77 (App. Div. 2003).

Here, the trial court's decision was based on judicial notice "of the fact that all Drug Courts operate with a policy of zero tolerance, that is, ingestion of any kind of mood-altering substance is considered a relapse and exposes the participant to sanctions." The court characterized this as judicial notice of a "fact." The court gave no context as to why drug courts consider any kind of mood-altering substance a relapse. Nor did the court explain why drug court policy would be applicable to J.S., who had not committed a crime and who did not consume sufficient quantities of alcohol to permit the State's expert to

A-3769-15T2

conclude either that he suffered from alcohol-induced mood disorder or that his alcohol dependence was "severe." Yet, from the judicial notice of this "fact," the court inferred "an acknowledgment in New Jersey that current science favors abstinence as the only acceptable response to alcohol dependence."

The court inferred from this judicially noticed fact that J.S. willfully defied the commonly accepted response to alcohol dependency. More importantly, the court concluded from its judicially noticed fact there was a great risk the next time J.S. experienced significant stress he would consume excessive quantities of alcohol and possibly further abuse his wife.

It is questionable whether the "facts" judicially noticed — perhaps based on the court's experience in drug court — were the proper subject of judicial notice. See N.J.R.E. 201(b). But even if they were, the court was obligated to provide the parties with "an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed." N.J.R.E. 201(e). The appellate record does not establish that the court gave the parties the opportunity to be heard. Certainly, taking judicial notice of a fact for the first time in a final written decision is not optimal, particularly in light of time restrictions on a party's right to appeal from a final order. The problem is compounded when the judicially noticed fact may very well turn on the opinions of experts.

20

Here, the court compounded the lack of notice by insinuating J.S. should have presented evidence from personnel involved with his in-patient rehabilitation or his family counselor that a minimal amount of social drinking was acceptable for those diagnosed with alcohol dependence. J.S. was never afforded an opportunity to address the court's judicial notice of its fact concerning abstinence. Had he been given a fair opportunity to respond, perhaps he would have adduced such testimony.

For this reason, we agree the order denying J.S.'s application must be reversed and the matter remanded for a new hearing. If, on remand, the court intends to take judicial notice of any facts, it shall provide the attorneys the opportunity to be heard as to the propriety of taking such notice. Further, if such facts would likely be the subject of expert testimony, the court shall provide sufficient advance notice of what it judicially notices so the parties have the opportunity to address the issue at a hearing.

We have considered the State's cross-appeal and determined it is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Reversed and remanded for a new hearing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION