**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1626-21

IN THE MATTER OF
THE REVOCATION OF
G.G.'S[1] FIREARMS
PURCHASER
IDENTIFICATION CARD
AND COMPELLING THE
SALE OF HIS FIREARMS.

_____

Submitted January 18, 2024 – Decided February 5, 2024
Motion for reconsideration granted.
Resubmitted February 21, 2024 – Decided February 27, 2024

Before Judges Currier and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. GPR-0023-21

Evan F. Nappen Attorney at Law, PC, attorneys for appellant (Louis P. Nappen, on the briefs).

Mark Musella, Bergen County Prosecutor, attorney for respondent (K. Charles Deutsch, Assistant Prosecutor, of counsel and on the brief).

---

[1] We use initials because the trial court relied on sealed healthcare records in its decision and to protect appellant's confidentiality. R. 1:38(a)(2).

PER CURIAM

Appellant G.G. appeals from a December 23, 2021 Law Division order granting the State's motion to revoke his Firearms Purchaser Identification Card (FPIC) and compelling the sale of his firearms pursuant to N.J.S.A. 2C:58-3(c)(5). The court found that permitting G.G. to retain his FPIC was not in the interest of the public health, safety, and welfare based on his history of depression and suicidal ideation. G.G. contends N.J.S.A. 2C:58-3(c)(5) is unconstitutional in light of Bruen[2], and the statutes the State and trial court relied upon are not disqualifiers to firearm possession or a statutory means to forfeit, sell, or destroy firearms. After reviewing the record and applicable legal principles, we affirm.

I.

We summarize the facts developed in the record. On November 18, 2018, the Wyckoff Police Department received a call reporting that a resident, thirty-nine-year-old G.G., was missing and potentially suicidal. Earlier in the day, G.G. attended a football game. His wife, L.G., was in Long Island. The two had been experiencing marital difficulties and fought via text messages throughout the day. One of G.G.'s text messages to his wife read, "Don't worry

_____

[2] New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022).

2                                                          A-1626-21

you will NEVER have to deal with me again and nobody." According to L.G., G.G. had previously told her "he [wa]s better off putting a bullet in his head so [she] would not have to deal with him [a]gain." At the time, G.G. was taking antidepressant medications, Wellbutrin and Cymbalta. G.G.'s father had passed away one week earlier from pancreatic cancer.

After L.G. returned home that evening and put their son to bed, she noticed a single .40 caliber bullet on the floor of the couple's bedroom near the safe where G.G. stored his firearms and ammunition. L.G. had never seen a gun or a bullet anywhere near her husband before and was concerned in light of his text message earlier that day. G.G. had been drinking excessively while his father was in hospice care before he died.

L.G. was unsuccessful in attempting to contact G.G. Ultimately, a family member called the police, who found G.G. at a friend's home. G.G. was then transported via ambulance to the hospital where he underwent a risk assessment and a psychiatric evaluation. The hospital personnel noted he was intoxicated and diagnosed him with depression and alcohol use disorder. Hospital staff recommended G.G. follow up with a psychiatrist for medication monitoring, a grief counselor, a marital counselor, and that he attend an alcohol rehabilitation program.

A-1626-21

G.G. was discharged ten hours later by the covering psychiatrist because he had no suicidal ideation, and no previous suicidal attempts were reported. The hospital nurse who treated G.G. was uncomfortable releasing him unless he surrendered his firearms. G.G. agreed to do so. The nurse also contacted the Wyckoff Police Department about removing G.G.'s guns.

Two days later, on November 20, 2018, G.G. voluntarily surrendered his firearms to the Wyckoff Police Department. On April 12, 2019, G.G.'s counsel requested the return of the firearms. The police denied the request. G.G. filed a complaint against the Township of Wyckoff for the return of his firearms, which included a handgun he had kept in his bedroom safe, a handgun previously stored in a locked toolbox in his garage, and seven long guns kept in a "construction toolbox" on a "top shelf" at a warehouse, which he accessed using a forklift. G.G. claims his complaint for the return of his firearms went unanswered.

Almost two years later, on March 26, 2021, the State moved to revoke G.G.'s FPIC and compel the sale of his weapons under N.J.S.A. 2C:58-3(c)(5), as not in the interest of public health, safety, or welfare. On December 22, 2021, the trial court conducted a one-day virtual hearing. G.G. was represented by counsel. Wyckoff Police Patrol Officer Michael Flim, Sergeant Michael

DeMaio, and L.G. testified on behalf of the State. A psychiatrist, Dr. David Brozyna, testified on behalf of G.G., and G.G. testified on his own behalf.

Officer Flim testified about the efforts undertaken by the police to locate G.G. on the day in question. Flim also explained how G.G. "surrendered" his "Glock 17" to the police. G.G.'s counsel stipulated to G.G.'s weapons being found in the house. On cross-examination, Flim stated G.G. told him the bullet was on the bedroom floor because he was getting money out of the bedroom safe, and "the bullet fell out."

Sergeant DeMaio testified he was dispatched to G.G.'s residence on the day in question in response to a "missing person[s] call with a mental health component." Sergeant DeMaio explained he received a phone call from a hospital emergency room employee who expressed concern about G.G.'s mental health and releasing him while he still possessed firearms. In response, Sergeant DeMaio testified he conducted a NCIC[3] check to determine if any firearms were registered to G.G. Sergeant DeMaio stated he spoke to G.G. about surrendering his firearms, where they were kept, and how they could be collected. The weapons were recovered, but Sergeant DeMaio did not know if they were ever returned to G.G.

---

[3] National Crime Information Center.

L.G. testified she has been married to G.G. for seven years, and they have a five-year-old son. On the day in question, L.G. told G.G.'s good friend over the phone that she was worried about her husband because his father recently passed away, and it was "very out of the ordinary" to see a bullet on their bedroom floor. She was also concerned that she could not get in touch with G.G. because they had been arguing. L.G. testified G.G. took some weapons out of their home for safety reasons after their son was born and kept them at a warehouse, where he rented a shop. L.G. explained she has "never seen a gun" in her home but knew the guns were there.

On cross-examination, L.G. stated she never spoke to anyone at the hospital about G.G. L.G. testified she had not observed G.G. drink alcohol in their home in the past four years, but he does drink beer at football games. She also mentioned there were "no issues right now" regarding their marriage.

Counsel stipulated to Dr. Brozyna testifying as an expert in the field of psychiatry. Dr. Brozyna stated G.G. requested an evaluation of his ability to handle and maintain firearms and for the return of his firearms. Dr. Brozyna reviewed G.G.'s hospital records and explained that G.G. was never "committed to a hospital" for psychiatric reasons. In referring to the hospital records, Dr.

6

Brozyna testified there was no previous history of suicidal attempt and no "apparent suicidal ideation."

In describing G.G.'s demeanor during the evaluation, Dr. Brozyna stated he was "very pleasant, very easygoing" and "[h]is mental status exam didn't show any alterations in mental status . . . and no delusional thinking." Dr. Brozyna did not detect evidence of a "depressive type phenomenon going on," and his medication "seemed to be working very well." The expert stated G.G. was "very frustrated" by his situation but had no "suicidal intentions." Within a reasonable degree of psychiatric certainty, Dr. Brozyna opined there was "no problem whatsoever" with G.G. possessing a firearms permit and firearms. In response to a question posed by the trial court, Dr. Brozyna responded that he did not review G.G.'s primary care physician's records regarding G.G.'s history.

On cross-examination, Dr. Brozyna stated he diagnosed G.G. with "a major depressive disorder" as a "working diagnosis." Dr. Brozyna testified the antidepressants G.G. was taking controlled his depressive disorder, and he was in "full remission," meaning "there's no symptoms of a major depressive disorder." Dr. Brozyna did not diagnose G.G. with alcohol use disorder.

G.G. testified that he was never treated by a psychiatrist before November 2018. He began taking antidepressants "around the same time of the day in

question" because he experienced anxiety after his father passed away. G.G. testified that he never attempted to commit suicide before November 2018 and denied ever telling anyone that he would be "better off" putting a bullet in his head.

While attending the game, G.G. testified his wife was "badgering" him about what time he was coming home. Regarding the text message about not having to "deal" with him again, G.G. admitted he sent it after the game ended, but when he sent the text message, he had no intention of harming himself, or anyone else, and he was not contemplating suicide. G.G. explained the text message meant to convey to his wife that he was "intent" on leaving their house and "potentially" ending the marriage. According to G.G., the marital discord was due to his "working too much," not being home when he should, and a "few instances" of drinking when he went out after work.

G.G. testified he packed some clothes and took $2,500 out of the safe before leaving the home that night because he planned to stay elsewhere for a few days. G.G. explained he keeps guns "for self-protection." After he left the house, G.G. testified he went to a friend's house. When the police arrived, G.G. stated he told them his firearms were "locked up" at his house, and he was unarmed.

8

G.G. testified he went on his own accord to the hospital. He claimed he did not see the bullet fall out when he took money and clothes out of the safe but learned about it from Officer Robert Martino. G.G. testified he consented to turn over his firearms to the police upon his discharge from the hospital and cooperated in collecting them. G.G. represented that no domestic violence complaints were ever filed against him.

On cross-examination, G.G. stated he first applied for an FPIC in 1998, which was approved by the municipality where he lived, and applied again in 2004 when he changed his address. That application was also approved.[4] G.G. admitted he never submitted a change of address application when he moved to Wyckoff. In 2010, G.G. testified he applied for two handgun purchase permits (HPP), which were approved. G.G. reiterated the import of the text message to his wife was that perhaps he might seek a divorce. G.G. testified he had "maybe four or five drinks over the course of the football game" on the day in question, and he was drinking "more than usual" after his father died. G.G. stated he was at the hospital for "[a]bout six hours," not ten hours.

After considering the testimony and evidence, including Dr. Brozyna's report, the hospital records, firearms documents, and counsel's arguments, the

---

[4] The record does not indicate which municipality approved the 2004 FPIC.

9    A-1626-21

trial court rendered an oral opinion granting the State's revocation motion and finding G.G.s retention of his FPIC was not in the interest of the public health, safety, and welfare. Regarding the testimony, the trial court found Officer Flim's testimony "to be most direct, most credible, and consistent throughout." The trial court emphasized it was only concerned with "whether or not it's in the public health, safety, and welfare to allow [G.G.] to retain his firearms."

The trial court stated "it was not convinced by a preponderance of the evidence that there was a confinement for a mental disorder" and it was "not altogether clear on whether or not there was an involuntary trip to the hospital on that day." In addition, the trial court rejected Dr. Brozyna's opinion that G.G. "does not pose a danger to himself, others, or property and that he can safely handle and own firearms."

In particular, the trial court criticized Dr. Brozyna's failure to address the hospital records in detail, "particularly the flow notes," which contained "certain information" reported by G.G. and his wife. The trial court highlighted that G.G. has a "history of being treated for a major depressive disorder and anxiety" and emphasized that Dr. Brozyna did not review G.G.'s records from his primary care physician, who prescribes his anti-depressant medication, which "is

10

relevant here." The trial court noted Dr. Brozyna simply relied on G.G.'s "self-reporting" in formulating his opinions.

The trial court found G.G.'s testimony that the bullet or shell casing must have fallen out of the safe when he took out money was not credible. By a preponderance of the evidence, the trial court found G.G. "placed that bullet there himself," and "he did that on purpose" to send a "message to his wife." The trial court explained that is "not the behavior one would expect of someone who's expected to own, possess, and safely handle firearms." Based upon the hospital records, the trial court noted the flow notes reflect a concern that G.G. "had been drinking excessively" on the day in question. The trial court also found evidence in the hospital records that G.G.'s treatment for depression "preceded the 2018 incident by four years," and that L.G. informed hospital staff that G.G. "becomes a different person when he drinks."

The trial court noted G.G. appeared "physically nervous" to the point that he "could even see him turn red at various points, even over video, during the course of his testimony." The trial court also found L.G. came across as "nervous" during her testimony, but she was "credible" regarding her concern for her husband based upon the text message he sent to her that "she would never

have to deal with him again" in tandem with finding a bullet on their bedroom floor. Ultimately, the trial court found G.G. was not truthful and stated:

> And again, I have a concern about the suicidal and provocative statements which one can infer were suicidal in nature. And even if they weren't—I will repeat, even if he had no real intention to harm himself or not, the very fact his actions in placing that round there for his wife to find, that in and of itself is extremely disturbing and that conduct is relevant. So for all of those reasons, I'm granting the State's motion to revoke.

On December 23, 2021, the trial court issued an order granting the State's motion to revoke petitioner's FPIC and compel the sale of his firearms and ammunition pursuant to N.J.S.A. 2C:58-3(c)(5). The trial court noted it was not disqualifying G.G. based on N.J.S.A. 2C:58-3(c)(3) because it was not convinced by a preponderance of the evidence that he was "confined" due to a mental disorder. The trial court also ordered G.G. to "immediately surrender to law enforcement any firearms and ammunition in his custody or control, or which he possesses or owns"; in lieu of immediate destruction, G.G. has "120 days from the date of this [o]rder to arrange for a Federal Firearms License Dealer to purchase the firearms currently in the possession of the State," and if G.G. does not arrange for the sale of firearms within 120 days, his firearms will be subject to destruction; and G.G. is "prohibited from transferring, selling,

12

giving, assigning, or otherwise disposing of his firearms to an immediate family member." This appeal followed.[5]

G.G. raises the following arguments for our consideration:

POINT 1

PER BRUEN, DENIAL OF SECOND AMENDMENT RIGHTS UPON A "NOT IN THE INTEREST OF PUBLIC HEALTH, SAFETY, OR WELFARE" STANDARD IS UNCONSTITUTIONAL.

A. In Accordance With Bruen, Government Must Prove That Denying Second Amendment Rights Upon A Statutory Standard Of "Not In The Interest Of Public Health, Safety, Or Welfare" Is Consistent With This "Nation's Historical Tradition Of Firearm Regulation," (e.g., from 1791 to, arguably, 1868).

B. "Not In The Interest Of Public Health, Safety, Or Welfare" Constitutes An Unconstitutional Balancing Test Per Bruen.

C. N.J.S.A. 2C:58-3(C)(5)'s Denial Of People's Second Amendment Rights As "Not In The Interest Of Public Health, Safety Or Welfare" Constitutes Exactly The Type Of Discretion Not Permitted Under Bruen.

POINT 2

THE COURT BELOW ERRED BY ORDERING THE FORFEITURE OF FIREARMS PURSUANT TO NO

---

[5] Pursuant to the amended notice of appeal, G.G. appeals from the order entered on December 23, 2021.

STATUTE AUTHORIZING THE FORFEITURE OF FIREARMS.

POINT 3

THE COURT BELOW ERRED BECAUSE N.J.S.A. 2C:58-3(F) DOES NOT AUTHORIZE THE FORFEITURE, COMPELLED SALE, OR DESTRUCTION OF FIREARMS AND PROHIBITS ADDED CONDITIONS OR REQUIREMENTS NOT SET FORTH UNDER THE CHAPTER.

POINT 4

THE COURT BELOW ERRED BECAUSE "INTEREST OF PUBLIC HEALTH, SAFETY OR WELFARE" IS NOT A DISQUALIFIER TO FIREARM POSSESSION AND DOES NOT AUTHORIZE FORFEITURE OF FIREARMS.

POINT 5

IT IS RESPECTFULLY REQUESTED THAT ANY OPINION REFERENCE PETITIONER BY HIS INITIALS OR THAT THE MATTER OTHERWISE BE SEALED OR IMPOUNDED.

II.

Our review of "a trial court's legal conclusions regarding firearms licenses [is] de novo." In re N.J. Firearms Purchaser Identification Card by Z.K., 440 N.J. Super. 394, 397 (App. Div. 2015). A "trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019)

14

(quoting <u>Manalapan Realty, L.P. v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995)).

If, however, an appellate court is reviewing a trial court's findings of fact, the following standard of review applies:

> Ordinarily, an appellate court should accept a trial court's findings of fact that are supported by substantial credible evidence. Deference to a trial court's fact-findings is especially appropriate when the evidence is largely testimonial and involves questions of credibility. Thus, an appellate court should not disturb a trial court's fact-findings unless those findings would work an injustice.
>
> [<u>In re Return of Weapons to J.W.D.</u>, 149 N.J. 108, 116-17 (1997) (citations omitted).]

N.J.S.A. 2C:58-3 governs the purchase of firearms, including the issuance of FPICs and HPPs. Pursuant to N.J.S.A. 2C:58-3(c)(5), no FPIC "shall be issued . . . [t]o any person where the issuance would not be in the interest of the public health, safety or welfare." This provision "is 'intended to relate to cases of individual unfitness, where, though not dealt with in the specific statutory enumerations, the issuance of the permit or identification card would nonetheless be contrary to the public interest.'" <u>In re Z.L.</u>, 440 N.J. Super. 351, 356 (App. Div. 2015) (quoting <u>In re Osworth</u>, 365 N.J. Super. 72, 79 (App. Div. 2003)).

"'A judicial declaration that [a person] poses a threat to the public health, safety or welfare involves, by necessity, a fact-sensitive analysis.'" In re Forfeiture of Pers. Weapons & Firearms Identification Card Belonging to F.M., 225 N.J. 487, 505 (2016) (quoting State v. Cordoma, 372 N.J. Super. 524, 535 (App. Div. 2004)). The State "has the burden of proving the existence of good cause for the denial by a preponderance of the evidence." Osworth, 365 N.J. Super. at 77.

We have found unfitness under subsection (c)(5) in a variety of circumstances. For instance, the exclusion has been applied to those who have disregarded New Jersey's gun laws. See Osworth, 365 N.J. Super. at 80-81; State v. Cunningham, 186 N.J. Super. 502, 510-13 (App. Div. 1982). However, misusing a weapon is not required for a denial under subsection (c)(5). F.M., 225 N.J. at 514. We have also applied the statute to someone convicted of disorderly persons offenses. See In re Sbitani, 216 N.J. Super. 75, 76-78 (App. Div. 1987) (affirming denial of an FPIC because of the individual's conviction for possession of less than twenty-five grams of marijuana).

In State v. Freysinger, 311 N.J. Super. 509, 516-17 (App. Div. 1998), we applied the exclusion to someone who had been convicted of driving under the influence, refused to undergo chemical tests, and struck his girlfriend with his

car before leaving her "unattended in the roadway." Individuals who have a history of domestic violence—whether documented or admitted—also have been found unfit to purchase a firearm under subsection (c)(5), even though they had no convictions for domestic violence. F.M., 225 N.J. at 510-16; Z.L., 440 N.J. Super. at 356-59.

A.

We first address G.G.'s argument that the public health, safety, or welfare standard set forth in N.J.S.A. 2C:58-3(c)(5) is unconstitutional based on the United States Supreme Court's decision in Bruen, 597 U.S. 1 (2022).[6] We recently addressed and rejected substantially the same argument. M.U., 475 N.J. Super. at 190-95. In M.U., we found that N.J.S.A. 2C:59-3(c)(5)'s standard was not unconstitutional in light of the new standard established by Bruen because it is consistent with "this Nation's historical tradition of firearm regulation," and

---

[6] Before Bruen, courts analyzed Second Amendment challenges under a two-prong test. The first prong was focused on whether the challenged law burdened conduct covered by the Second Amendment, and the second prong assessed whether the challenged law withstood "means-end scrutiny." Bruen abolished that framework and directed courts to focus on the text of the Second Amendment and "the Nation's historical tradition of firearms regulation" instead. Bruen notes, "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" 597 U.S. at 24.

is not overbroad or impermissibly vague. Id. at 163. We see no reason to deviate from that well-reasoned analysis and conclude N.J.S.A. 2C:58-3(c)(5) is constitutional for the same reasons. Therefore, we affirm the order granting the revocation of G.G.'s FPIC and firearms.

B.

Next, G.G. contends the trial court erred by ordering the forfeiture of his firearms pursuant to statutes that do not authorize the forfeiture, compelled sale, or destruction of said firearms. He argues that N.J.S.A. 2C:58-3(f) and N.J.S.A. 2C:58-3(c)(5) solely address HPP and FPIC licensing issues, and these statutes did not authorize the trial court to order the forfeiture of his weapons. The State avers G.G.'s arguments are moot because he did not move before the Law Division or this court for a stay, and the deadline to arrange for the sale of his firearms has since elapsed. In M.U., we specifically rejected the mootness argument in this context and held, "[t]he lack of a stay pending appeal is not dispositive. Nor is the absence of an application for emergent relief." 475 N.J. Super. at 202.

In M.U., 475 N.J. Super. at 203, we addressed the forfeiture and compelled sale of the petitioner's firearms under N.J.S.A. 2C:58-3(f). We reversed the forfeiture and compelled sale of the petitioner's firearms and remanded for the

18

trial court to determine if the "firearms may be returned from the federally licensed firearms dealer, or whether some other remedy is available." Id. Ultimately, we found that N.J.S.A. 2C:58-3(f) "did not provide any basis for the forfeiture of firearms already possessed." Id. at 199. The same rationale applies here.

G.G. also argues that the trial court, in rendering its decision, solely relied on N.J.S.A. 2C:58-3(c)(5), which allows the Law Division to deny the issuance of a FPIC or HPP, but does not act as a disqualifier to firearm possession or a statutory means under which to forfeit, compel a sale, or destroy actual firearms. In M.U. we also addressed the forfeiture and compelled sale of the petitioner's firearms under N.J.S.A. 2C:58-3(c)(5), and found that "[a]lthough the State argues that appellant's history of misconduct satisfied the public health, safety, and welfare disqualifier, that disqualifier applies to the issuance of HPPs and FPICs, rather than the right to possess firearms at home." 475 N.J. Super at 202.

Our Court addressed this issue when it decided J.W.D. There, the defendant's FPIC and firearms were seized after his wife filed a domestic violence complaint against him and a temporary restraining order (TRO) was entered. 149 N.J. at 111. After the TRO was dissolved, the defendant wrote a letter to the Hunterdon County Prosecutor's Office requesting his FPIC and

firearms be returned.  Id.  The Hunterdon County Prosecutor's Office returned J.W.D.'s FPIC and firearms.

J.W.D.'s wife filed a second domestic violence complaint against him and obtained a TRO that again required confiscation of his FPIC and firearms. J.W.D. filed a cross-complaint against his wife.  Id. at 112.  Following a trial, the Family Part dismissed the complaints and dissolved the TROs.  J.W.D. sent a second letter to the Hunterdon County Prosecutor's Office requesting the return of his firearms.

The State opposed, and after a hearing, the trial court ultimately found a "volatile situation" and that continued possession of a FPIC and firearms by the defendant "would not be in the interest of public health, safety, or welfare."  Id. at 113.

Our Court continued its analysis in J.W.D. and held the Legislature intended that "a court should not return weapons to a defendant who is a threat to the public health, safety, or welfare."  Id. at 116; see also State v. W.C., 468 N.J. Super. 324 (2021) (confirming J.W.D.'s conclusion that "the State is entitled to forfeiture of weapons [. . .] if the court finds that the defendant is disqualified from holding a [FPIC] [. . .] under N.J.S.A. 58-3(c)(5) because he or she poses a threat to the public health, safety, or welfare").  The J.W.D. Court concluded

the Legislature intended that courts not return weapons to a defendant in a domestic violence action—even after dismissal of the complaint—if the court finds that "the defendant poses a threat to public health, safety, or welfare." J.W.D., 149 N.J. at 116. Our Court had to reconcile the FPIC statute with the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, and emphasized "the return of weapons to a defendant who is a threat to the public— would be an invitation to a tragedy. We doubt the Legislature would have intended so disastrous a result." Id.

In State v. Cunningham, 186 N.J. Super. 502 (App. Div. 1982), prior to the Court's decision in J.W.D., we similarly determined that when a firearm is lawfully taken, "a return of the firearm to its owner at a time when the owner would be disqualified from obtaining a permit to acquire the firearm constitutes a transfer that is prohibited by the statute." Id. at 511. We stressed the clear intention of "the statutory design is to prevent firearms from coming into the hands of persons likely to pose a danger to the public." Id. This result is achieved "by providing for the revocation of an [FPIC] when its possession has become disqualified under N.J.S.A. 2C:58-3(c) subsequent to the issuance of the card." Id. at 511-12.

Guided by these principles, G.G. is not entitled to have his FPIC or firearms returned. Since the Wyckoff police lawfully obtained G.G.'s firearms because he voluntarily surrendered them, and we agree with the trial court that G.G. is no longer entitled to hold a FPIC pursuant to N.J.S.A. 2C:58-3(c)(5), returning the firearms would be contrary to the Legislature's intent and well-established law as enunciated in J.W.D. and Cunningham. The State is prohibited from transferring the firearms back to G.G.

To the extent we have not addressed G.G.'s remaining arguments, we are satisfied they are either moot or lack sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1626-21