# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4395-16T4

IN THE MATTER OF THE
SEIZURE OF WEAPONS
BELONGING TO T.Z.

_____

Submitted September 18, 2018 – Decided March 1, 2019

Before Judges Ostrer and Currier.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FO-02-0133-17.

Kevin G. Roe, attorney for appellant T.Z.

Dennis Calo, Acting Bergen County Prosecutor, attorney for respondent State of New Jersey (James W. Sukharev, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

T.Z. (Tammy)[1] appeals from the Family Part's March 23, 2017 order

granting the State's motion for the forfeiture of her firearms collection and

---

[1] As the matter involves claims of domestic violence, we use initials and pseudonyms to shield appellant's identity. See R. 1:38-3(d)(10).

Firearms Purchaser Identification Card (FPIC).  Police seized the firearms and FPIC after Tammy's husband, M.Z. (Malcolm), obtained a temporary restraining order (TRO) under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, which he later voluntarily dismissed.  Tammy later obtained a TRO against Malcolm, which she then dismissed.

We agree with Tammy's contentions that the evidence presented did not support the court's finding that returning her weapons would threaten the public health, safety or welfare under N.J.S.A. 2C:58-3(c)(5).  In particular, the court erred in considering Malcolm's acts of domestic violence against Tammy as grounds for denying her the return of her weapons.  We therefore reverse.

I.

At the plenary hearing on the State's forfeiture application, the State presented the testimony of Malcolm, as well as two Fair Lawn police officers.  Tammy testified in her own defense.

Tammy and Malcolm had been married for ten years at the time of the hearing, but they had been living apart for eleven months.  Both agreed there were no prospects for reconciliation.  It was Tammy's second marriage.  She had two children in their early twenties from her prior marriage, and the younger

child lived with her while working and going to school. Tammy had maintained long-term employment as an administrative assistant with a local school board.

Tammy also owned a collection of fifteen rifles and handguns.[2] She explained that she came from a family of hunters. Growing up in Vernon Township, and spending time on a farm in New York State, she had been acquainted with firearms since her teens. She stated she was trained in the proper handling, storage, and maintenance of firearms. A police witness confirmed that when they seized the collection, the various weapons had been stored in locked cases.

The hearing record, as well as the Family Automated Case Tracking System (FACTS) of which we take judicial notice, see N.J.R.E. 201(b)(4), reflects that as their marriage deteriorated, Tammy and Malcolm filed multiple PDVA complaints against each other. Tammy testified that the parties constantly argued and she accused Malcolm of infidelity. In 2011, 2013 and 2016, Tammy filed a domestic violence complaint against Malcolm and obtained a temporary restraining order (TRO), which she ultimately dismissed voluntarily

---

[2] Although the witnesses did not specifically describe the firearms, an officer who participated in the seizure testified that the collection consisted of "hunting rifles, shotguns, some handguns." It is unclear whether all the items were operational. The State noted that one of the firearms had a "trigger area missing."

 A-4395-16T4

before a final hearing. Malcolm did the same after filing complaints and obtaining TROs in 2013 and 2016.

Although neither party has ever alleged actual physical violence against the other or the actual use of weapons, Tammy's allegations were significantly more serious than Malcolm's. Malcolm also had a prior criminal record, with convictions for burglary and theft, although he said they occurred thirty-five years ago. In 2011, Tammy alleged that Malcolm "threatened to kill [her] during a verbal argument" after she said she was "done with [the] marriage." At that time, Tammy told the police that she "fear[ed] for her life" because she thought Malcolm was "going to kill her." Fair Lawn Police Sergeant Kevin Wood testified that he received Tammy's report.

Although Tammy was the alleged victim, and was granted exclusive possession of the Fair Lawn marital residence, Sergeant Wood and other officers seized about twenty-five firearms from Tammy's safe. Apparently, many of the weapons belonged to Tammy, although Malcolm asserted at the time that some of the weapons belonged to friends. The weapons were later returned,

presumably after Tammy dismissed the 2011 complaint.[3]  At the 2016 forfeiture hearing, Malcolm denied ever threatening Tammy with physical violence. Tammy also attempted to distance herself from the allegations in the 2011 PDVA complaint.

In 2013, Tammy filed another PDVA complaint against Malcolm.  He responded with a cross-complaint against her.[4]  He testified, "[J]ust because she put one against me, I put one against her for verbal harassment."  Malcolm was arrested in 2013 for violating the restraining order and stalking Tammy.  The cross-complaints were dismissed the same day and, several weeks later, the contempt complaint was, too.

In mid-March 2016, Malcolm filed a PDVA complaint alleging harassment, and secured the TRO that led to the seizure of the weapons that are at issue in this appeal.  In his complaint, Malcolm alleged that Tammy got drunk "on almost a daily basis and becomes verbally abusive towards him"; sent him harassing text messages; told Malcolm that a police officer with whom she had

---

[3]  The 2011 complaint was not formally dismissed until June 2013, according to FACTS.  The record does not indicate the precise date the weapons were returned.

[4]  The record does not include the 2013 complaints, nor does it indicate that weapons were seized after the TROs were entered.

a sexual relationship would make "[Malcolm's] life miserable if he was to drive in" the officer's locale; and told her cousin on the phone she would stay in the house she and Malcolm shared "until she drives [him] off the wall and leaves," without paying rent, "until the house is in foreclosure." This time, Tammy was removed from the marital home. But, before she left, she provided the Fair Lawn police with keys to the firearms cases in the basement, to assist them in removing her firearms collection.

In his testimony, Malcolm stated that he filed the 2016 complaint because he and Tammy "were having a bad time . . . we just weren't seeing eye to eye," while clarifying that "it was verbal. It was nothing physical." He admitted, "I said a lot of things to just try to . . . get her out of the house." Asked if his statements were true, he said, "Well, you know how you are in the heat of the moment, some of them are, some of them ain't." Asked whether his statement that Tammy would become intoxicated daily was true, Malcolm said, "Partially." Then, apparently fearful of admitting that he made a false statement under oath in his PDVA complaint, Malcolm asked for his attorney. The court decided to adjourn the hearing for another reason.

When the hearing reconvened, Malcolm was again asked about Tammy's alleged daily intoxication. He admitted that Tammy's drinking was more

6

moderate than he portrayed in his complaint. He said that she sometimes drank a glass or two of wine at dinner; other days, she drank nothing at all; but "there were a couple of days where she drank a little more than she should have." He said, "I think she was maybe having a little bit too much to drink to try to deal with what was going on" in their marriage. He described one instance where he found two empty bottles, although he could not say whether they had been opened previously. He admitted that his complaint falsely stated that her excessive drinking occurred the night before he filed his complaint, as he was not home that night. He said he filed the complaint because "we were arguing and I didn't want to be in that situation anymore." He also said the memory of his being ejected from the house in 2011 prompted him to take measures to secure his position. He explained, "I knew it was coming to a point where one of us had to leave, so I went to the courts and asked them how do I protect myself." Less than two weeks later, Malcolm dismissed the complaint and the restraints were dissolved.

Tammy testified that she did not return to the marital home but instead relocated to Pompton Lakes. In mid-July 2016, Tammy filed a PDVA complaint against Malcolm, alleging criminal trespass, harassment, and stalking. She alleged that he repeatedly appeared at her Pompton Lakes home unannounced,

parked his car in front of her house, and constantly texted and called her. The day she filed her complaint, she said Malcolm showed up uninvited, demanded to know where Tammy had been, and then pushed open the door and forced his way into the house. He demanded to speak about their relationship, but Tammy said it was over and he should leave. He went upstairs to the living room and flipped over a table. Two weeks later, Tammy dismissed the complaint.

Malcolm testified that he did not object to the return of Tammy's weapons. Sergeant Wood also said he personally did not object to the weapons' return, although he did not represent the official views of the department.[5]

In granting the State's motion for forfeiture, the court concluded that there existed a potential for violence that would threaten the public health, safety or welfare if Tammy's firearms were returned. The court recounted the repeated PDVA complaints; Tammy's alleged excessive drinking; Malcolm's prior criminal record; and her allegations that he threatened her in 2011 and forcibly entered her home in 2016 and flipped over a table. The court found that Tammy and Malcolm still had a "very, very contentious relationship," noting they were not yet divorced. In so concluding, the court mistakenly presumed that Tammy

---

[5] Tammy's counsel apparently had a letter presenting the Fair Lawn Police Chief's position, but it was not admitted into evidence.

still lived in the Fair Lawn house, intent upon staying there until a foreclosure. The judge stated, "So there's no doubt in this Court's mind that there is still an active dispute. As long as this defendant [Tammy] is in fact residing in the house waiting for foreclosure . . . ." Incongruously, the court then recounted Tammy's allegations about Malcolm's uninvited entry into her home, without acknowledging that the incident occurred at Tammy's new residence in Pompton Lakes.

Without making a specific credibility finding as to Malcolm, the judge gave weight to the allegations in his 2016 PDVA complaint, as opposed to his in-court testimony, regarding Tammy's alcohol consumption:

> So now we have this longstanding relationship with a . . . self-admitted convicted felon. We have people fighting over a house that's in foreclosure or that there's mention that it's going to go into foreclosure. <u>And now we mix in allegations that . . . were not rebutted regarding this defendant's potential issue with alcohol</u>.
>
> [(Emphasis added).]

Relying on <u>In re Z.L.</u>, 440 N.J. Super. 351 (App. Div. 2015), the court concluded that the potential for the marital discord to turn lethal warranted forfeiture of Tammy's weapons.

II.

It is now well-settled even where a PDVA complaint is dismissed without a finding of domestic violence, the prosecutor may seek the forfeiture of weapons seized pursuant to the TRO and N.J.S.A. 2C:25-21(d)(1)(b), if the defendant poses a threat to the "public health, safety or welfare," as provided by N.J.S.A. 2C:58-3(c)(5). In re J.W.D., 149 N.J. 108, 116 (1997) (permitting prosecutor to object to return of seized weapons "on the grounds . . . that the owner poses a threat to the public in general or a person or person in particular") (citing N.J.S.A. 2C:25-21(d)(3); then citing N.J.S.A. 2C:58-3(c)(5)); see also In re F.M., 225 N.J. 487, 510-11 (2016). The prosecutor's authority serves the PDVA's legislative goal to prevent domestic violence. In re J.W.D., 149 N.J. at 114, 116.

The catch-all "public health, safety or welfare" disqualifier, N.J.S.A. 2C:58-3(c)(5), encompasses unfitness to possess firearms not covered by more specific statutory barriers to obtaining an FPIC or handgun permit. In re F.M., 225 N.J. at 507. The statute specifically bars, among others, persons confined for mental disorders; "habitual drunkards"; drug-dependent persons; terrorists; and persons convicted of a crime or a disorderly persons offense involving domestic violence. See N.J.S.A. 2C:58-3(c). The prosecutor must prove a threat

to the public health, safety or welfare by a preponderance of the evidence. In re F.M., 225 N.J. at 513.

While the Legislature did not define "a threat to public health, safety or welfare," N.J.S.A. 2C:58-3(c)(5), the courts have found certain factors suggestive of such a threat. The use of physical force in a domestic dispute, for example, may justify forfeiture of firearms or an FPIC. See In re F.M., 225 N.J. at 491-94 (finding threat under N.J.S.A. 2C:58-3(c)(5) where the defendant, while arguing with his wife, threw her to the floor, put a gun to her head, and handcuffed her in front of their children); State v. Volpini, 291 N.J. Super. 401, 403-04 (App. Div. 1996) (finding threat where the defendant physically assaulted his wife during domestic dispute). Similarly, regular requests for legal intervention by a cohabitating couple with a history of violence may reflect a public danger, as access to a firearm may turn an already violent home "lethal." In re Z.L., 440 N.J. Super. at 358-59.

Criminal charges, whether preceding or resulting from the domestic violence complaint, may also support finding a threat to public safety, even if they are ultimately dismissed. Id. at 356. Thus, forfeiture may be proper where, despite the absence of a criminal conviction, "the underlying facts of any arrests

or reported domestic disputes support . . . the public safety disqualification."
Ibid.

A dangerous alcohol dependency, as well, may justify finding a risk to the public welfare. See State v. Freysinger, 311 N.J. Super. 509, 516-17 (App. Div. 1998) (holding the defendant's two DUI convictions, two convictions for refusing chemical tests, hit and run of a pedestrian, and possibly striking his girlfriend with his vehicle permitted finding him a threat to public safety); Hoffman v. Union Cty. Prosecutor, 240 N.J. Super. 206, 215 (Law Div. 1990) (citing the defendant's alcohol abuse problem and assaulting his wife while intoxicated as grounds for ordering forfeiture).

In addition, other risk factors that may be insufficient in isolation may disqualify a defendant "in conjunction with" the public safety factor. In In re Z.L., 440 N.J. Super. at 356-57, we noted that Freysinger, 311 N.J. Super. at 516, upheld a disqualification where a defendant both drank habitually and posed a threat to public safety; also, State v. Cordoma, 372 N.J. Super. 524, 536 (App. Div. 2004), held a defendant's mental condition, while insufficiently disabling to meet N.J.S.A. 2C:58-3(c)(2)-(3), nonetheless contributed to a public threat; and In re Osworth, 365 N.J. Super. 72, 80-81 (App. Div. 2003) held that prior conduct, while not a disqualifying conviction under N.J.S.A. 2C:58-

12

3(c)(1), supported finding a threat under subsection (c)(5). On the other hand, in State v. One Marlin Rifle, 30/30, 30 AS, Serial No. 12027068, 319 N.J. Super. 359, 372 (App. Div. 1999), we reversed a forfeiture order where the defendant had no criminal record or arrests, his alleged "outbursts" more likely reflected "frustration" about his marriage than dangerous behavioral tendencies, and other allegations of his wife lacked sufficient evidential support.

In reviewing a trial court's forfeiture order, we owe no deference to the trial court's legal conclusions, but must uphold factual findings supported by substantial credible evidence. In re J.W.D., 149 N.J. at 116. "Deference to a trial court's fact-findings is especially appropriate when the evidence is largely testimonial and involves questions of credibility." Id. at 117. Particularly "[w]hen a forfeiture action is brought because of domestic violence," the Family Part's "assessment necessarily involves an evaluation . . . of the parties' relationship and their history of domestic violence." In re F.M., 225 N.J. at 512. We accord "heightened deference" to such Family Part evaluations. Ibid.

On the other hand, "[w]here the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' we expand the scope of review." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (quoting In re Guardianship of J.T., 269

13

N.J. Super. 172, 188 (App. Div. 1993)). Also, a trial court's determination is subject to greater scrutiny when the court fails to assess witness credibility, or places undue emphasis on one party in a domestic relationship. See In re F.M., 225 N.J. at 515 (reversing Family Part's order returning seized weapons where court failed to assess expert witnesses' credibility and focused only on conduct of alleged victim of domestic violence and not of alleged perpetrator).

III.

Applying these principles, we conclude the trial court's factual findings lack sufficient evidential support in the record. Furthermore, the court erred in relying on Malcolm's acts of domestic violence against Tammy as a basis to bar the return of her firearms.

As for the fact-findings, the court concluded that the marital relationship was still highly contentious because Tammy still resided in the marital home in Fair Lawn, "waiting for foreclosure." We agree that the potential for marital discord is heightened when estranged spouses remain in the same household. However, in February 2017, Tammy testified without contradiction, that she had not lived with Malcolm for eleven months since his TRO of March 2016, and had instead resided several miles away in Pompton Lakes. At the time of the

hearing, both Tammy and Malcolm acknowledged that reconciliation was not possible.

The court also gave unexplained weight to Malcolm's March 2016 allegation that Tammy abused alcohol, without addressing Malcolm's credibility. Malcolm admitted he filed his complaint to get Tammy out of the house; he made his allegations "in the heat of the moment"; some of them were false; and his allegation of daily intoxication was only "partially" true. Although the court stated that Malcolm's claims about alcohol use went unrebutted, Malcolm himself, in fact, retracted his allegations at the hearing. He described an isolated occasion in which Tammy drank to excess, which he attributed to the stress of their marital relationship. Otherwise, he testified, Tammy sometimes drank a glass or two of wine, sometimes not. Malcolm also admitted that his complaint falsely attributed actions to Tammy on a day he was not even present. This record did not support the court's reliance on Tammy's "potential issue with alcohol."

The court also gave undue weight to the instances of domestic violence in which Tammy was a victim, not a perpetrator. The court credited Tammy's 2011 allegations that Malcolm threatened to kill her. The court also found it significant that just seven months prior to the hearing, Tammy alleged in a

PDVA complaint that Malcolm showed up at her house, pushed his way in, demanded they speak about their relationship, and flipped over a table. However, even assuming the risk that Malcolm's abusive behavior might continue – although no evidence surfaced of any subsequent acts – that would not justify the forfeiture of Tammy's firearms. In deciding whether a threat to public health, safety and welfare exists, the court must focus on the "individual unfitness" of the firearms owner. See In re F.M., 225 N.J. at 507 (quoting In re Osworth, 365 N.J. Super. at 79). That Malcolm's behavior might endanger Tammy does not render her unfit to possess her firearms. Notably, in other cases in which our courts have approved forfeiture orders on account of PDVA complaints, the owner was the perpetrator of domestic violence, not the victim. See, e.g., In re F.M., 225 N.J. at 492-94; In re J.W.D., 149 N.J. at 110-13; Freysinger, 311 N.J. Super. at 511-13.[6]

---

[6] In re Clark, 257 N.J. Super. 152, 153-54 (Law Div. 1992), does not suggest otherwise. There the Law Division upheld the denial of an application for two handgun permits because the applicant's husband had a criminal conviction, which disqualified him from obtaining a permit, N.J.S.A. 2C:56-3(c)(1), and would make it a crime for him to possess a handgun, N.J.S.A. 2C:39-7. Ibid. The court emphasized that granting the application would create a real danger of the husband's unlawful possession, because the applicant sought the guns for the specific purpose of target practice with her husband. Ibid. Particularly since Tammy no longer resides with Malcolm, neither his disability to possess a firearm nor his alleged acts of domestic violence against Tammy – terroristic

In reaching a contrary conclusion, the trial court misplaced reliance on Z.L. Like this case, Z.L. involved numerous complaints of domestic disputes, which we noted in affirming denial of a husband's application for an initial FPIC and three handgun permits. 440 N.J. Super. at 358-59. The husband had a continuing, volatile relationship with his wife, who had called police to the home on five separate occasions, alleging he assaulted her and engaged in other acts of domestic violence. Id. at 358. Although no criminal charge was sustained, the trial court credited the wife's complaints. Id. at 354-55. We affirmed, finding that since the husband and wife still lived together, adding firearms to "the volatile situation" would beg a tragedy to occur, imperiling public health, safety and welfare. By contrast, Tammy was not the alleged perpetrator of domestic violence and, further, she no longer resided with Malcolm.

Tammy has no criminal record and no arrests. And, unlike the defendant in Freysinger, there was no evidence that Tammy ever violated the law or handled firearms while intoxicated. Furthermore, the trial court did not definitively find whether Tammy even engaged in the acts of verbal harassment that Malcolm alleged. Malcolm conceded that he filed a complaint in 2013

threats in 2011 and criminal trespass, stalking, and harassment in 2016 – justifies forfeiture of her weapons under the circumstances of this case.

A-4395-16T4

simply because Tammy filed one against him. He himself discredited his earlier claim of habitual drunkenness, and he never addressed his other allegations of verbal harassment. But, even if we credit them, they amount to nothing more than taunting typical of a spouse in a deteriorating relationship. As noted, Tammy had not lived with Malcolm in eleven months at the time of the hearing and professed no desire to reconcile. In short, the court's findings do not support the conclusion that Tammy was unfit to regain possession of her firearms.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4395-16T4